guarantors serve to reduce the amount of the obligation and limit KST's ability to recover on it. Therefore, KST's receipt of funds from liquidation of Denro's and SPU's pre-joint venture inventory serves to reduce JISCO's Trade Payable debt to that extent.

The arbitration agreement invoked by KST is broad. Pursuant to its terms, the Arbitral Tribunal is competent to resolve all issues that relate to the Trade Payables, including the existence of the debt, whether it has been extinguished in whole or in part, including by acts of third parties, and whether any remaining unsatisfied portions are due now.

Under Swedish law, which the Tribunal has already determined is the *lex arbitri*, an arbitration agreement that has not clearly restricted the jurisdiction of the arbitrators should be given the maximum scope, regardless of the wording chosen.

In this case the arbitration agreement is indeed broadly formulated; it covers "any controversy arising out of the present contract in any manner". It expresses the intent of the parties to bring within the remit of the arbitrators any controversy between them that is in any way the product of the agreement. In the instant case, the rights allegedly created by the parties' contract – the Trade Payables – become the subject of, indeed they become a reason for, the MoUs and Forbearance Agreements and serve as the basis for the joint venture agreements and a key catalyst of KST's ability to induce Denro and SPU to accept the fraudulent representation.

In addition, the Arbitral Tribunal is clearly competent, as it has recognized, to prevent KST from obtaining a double recovery, if KST is successful in its counterclaims in the Texas litigation. Thus, because KST has placed the obligation before the Arbitral Tribunal, the Arbitral Tribunal must necessarily have the power to rule on anything that would have the effect of extinguishing the obligation on which KST bases its claims, whether that effect is a direct one – as in the viability of the obligation – or an indirect one – such as the payment of all or part of the obligation by a guarantor.

KST now asserts that the real purpose of the liquidation was to raise capital for Denro, but its own actions demonstrate that this is false. The entire structure of the joint venture, as expressed in the MoUs, was designed to assure that funds from operations flowed to KST to pay down the obligation. The sole purpose of the security agreements and the agreement to continue the lockbox arrangement was assuring that the funds generated from accounts receivable and inventory would flow to KST. Balli never told Jindal that, rather than put capital into the joint venture, it would raid the lockbox to fund the venture.

In this arbitration, moreover, KST told the Arbitral Tribunal that full credit would be given for the amounts paid down. However, KST has changed its position and now deliberately pursues a double recovery to which it is not entitled and which it previously disavowed.

JISCO contends that the $14.5 million collected by Balli reduced the debt to KST, because Balli's right to those funds came from security agreements, in which Jindal's pre-joint venture assets were pledged to secure the pre-joint venture debts, including the Trade Payables. Furthermore, the full amount of the liquidation proceeds should be set off against the Trade Payables. KST contends that Jindal should get no credit because: (i) the money was collected from the guarantors, Denro and SPU, rather than from JISCO; and (ii) subsequent to its receipt of the payments, Balli chose to put those funds into the joint venture.

Although the joint venture claims have clearly been allocated to the Texas litigation, Balli still relies on some of the joint venture activities as the basis for its claims that it can avoid giving Jindal credit for the liquidation proceeds. Thus, as a result of Balli's claims, some of these facts remain germane to this arbitration. For example, the Alaghbands were convicted in Germany in December 2005 of breaches of fiduciary duties for taking Klöckner's own money to fund the Balli acquisition of Klöckner & Co. This type of financial irregularity is in essence what Balli claims it was entitled to do in this case – receive Jindal funds, not give Jindal credit for them, use them to fund Balli's capital obligations to the joint venture, and then claim they were new "loans" requiring repayment with interest.

KST argues, in effect, that a secured lender can take possession of the security, sell it, and apply the proceeds to other alleged, unsecured debts without reducing the secured debt. But KST can provide no evidence that the liquidation proceeds were received by Balli for any other reason than the security agreements and the 2001 MoU, all of which require application of the proceeds towards satisfaction of the pre-joint venture debts that they secured. Thus, the only legitimate application of the proceeds was to reduce the pre-joint venture debts secured by the liquidated pre-joint venture assets. Indeed, until late in this arbitration, no one had ever suggested that there could be any other basis on which Balli received these proceeds.

It is simply impossible to read the MoUs, the parties' agreements and the documentary record to mean anything other than what JISCO argues: that the proceeds of liquidation of pre-joint venture assets reduced the pre-joint venture debts.

Moreover, in this proceeding against JISCO, the full $14.5 million asset liquidation proceeds should offset the Trade Payables. KST has sued Denro and SPU to recover the $5.6 million of the Foothill Loan and $1.8 million advanced to pay their pre-joint venture third-party payables. KST's claims in the Texas litigation are subject to Denro's and SPU's breach of contract and fraud in the inducement defenses. To allow KST in this proceeding credit for those amounts improperly predetermines the outcome of the Texas litigation and risks double recovery. Of course, KST does not – and cannot – seek to recover the Foothill Loan or the $1.8 million advance directly from Denro or SPU in these arbitration proceedings against JISCO, which was not a party to those cases. It should not be heard to do so indirectly.

KST cannot overcome the evidence linking the right to receive the proceeds of the liquidation with the agreements that require application of the proceeds to the pre-joint venture debts. It has therefore invented two arguments based on post-security agreement events to explain why these liquidation proceeds could be applied to alleged debts other than the Trade Payables the assets secured.

The first theory is the contention that the liquidated pre-joint venture receivables could be used to pay later debts. The second theory involves the proceeds of the liquidation of pre-joint venture inventory as joint venture "sales" proceeds.

KST's contention that the liquidated pre-joint venture receivables could be used to pay later debts is mistaken.

KST acknowledges, as it must, that it received the proceeds from the liquidation of pre-joint venture receivables. KST alleges, however, that these proceeds were used by KST to fund new loans – KST uses the term "re-lent" – and that it was entitled to use the liquidation proceeds to pay off these "loans" rather than to reduce the Trade Payables. In effect, KST

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

argues that it later acquired the right to ignore the parties' agreement on the use of liquidation proceeds and that it exercised this alleged right without ever telling Jindal (or anyone) that it had done so. KST's argument is based on several false premises. Moreover, even were it not utterly baseless, it would be irrelevant.

KST's purchase of the Foothill Loan did not permit unilateral, undisclosed and retroactive abrogation of the parties' agreements on use of liquidation proceeds.

KST claims that under the Foothill Loan Agreement, it was entitled to apply the liquidation proceeds to outstanding "loans" other than the Trade Payables, notwithstanding the parties' prior explicit agreement and subsequent acknowledgement to the contrary. KST's entire defense on the application of the receivables is based on the argument that it can rely on the Foothill Loan Agreement to overcome the parties' agreements on use of liquidation proceeds and the evidence showing that the receivables were, in fact, allocated to reduce the pre-joint venture debt. However, the provision in the Loan Agreement on which Balli wants to rely -- that the Lender, in its discretion, could make further loans to the Borrower under the Loan Agreement -- is contained in the loan documents that Denro and SPU signed with NationsCapital. Foothill bought the NationsCapital loans and subsequently sold them to KST. The Loan Agreement makes no reference whatsoever to the Balli-Jindal agreements. This is not surprising, given that KST merely succeeded to the Loan Agreement when it purchased the Foothill Loan. The provision was never negotiated between Jindal and Balli, and there is no evidence whatsoever that KST's acquisition of these loans was intended to abrogate the parties' express agreement that the proceeds from liquidation of Jindal's pre-joint venture receivables and inventory would serve to reduce its pre-joint venture debt to KST.

In addition, this new position is flatly contradicted by the evidence of the parties' own understanding as to what was happening. For example, in the 2003 MoU -- long after the Foothill Loan purchase, the parties clearly record their understanding, not only that there were no "new" debts, but that the proceeds were to be applied to the pre-joint venture debt.

In effect, KST asserts that upon purchasing the Foothill Loan, it gained the right to use the unrelated Loan Agreement to avoid the parties' post-Loan Agreement agreements on use of the proceeds of pre-joint venture receivables and to apply the proceeds as it wished on after-the-fact debts allegedly incurred in the joint venture, all without telling anyone that it had decided to take these steps. KST also argues that it could exercise this imaginary "right" in 2006, to unwind prior agreements and overcome contrary evidence. There is no evidence to support Balli's newly-invented and never-before articulated "right".

Moreover, this argument depends on the existence of other debts created in the context of the joint venture, which Balli cannot establish and which, in any event, have been allocated to the Texas litigation for consideration.

Balli's assertion that the receivables proceeds were "re-lent" is mistaken, confuses JISCO with Denro and SPU and would be irrelevant even if it were true.

Because Balli's theory regarding the pre-joint venture receivables depends on use of a provision in the unrelated Foothill Loan Agreement, Balli must also show that there are other "loans". But, apart from an initial loan of $1.8 million to pay other pre-joint venture Jindal debts, the only funds flowing from Balli were to the joint venture and were Balli's joint venture contributions in the form of tolling fees or advances on tolling fees. So, Balli must

argue that the funds used to fund Balli's contributions, which include the proceeds from the liquidation of pre-joint venture receivables, were in fact "loans".

To that end, Balli alleges that the proceeds from liquidation of pre-joint venture receivables were "re-lent" to Denro and SPU under the Foothill Loan Agreement. As a threshold matter, this assertion merely assumes as correct Balli's position in the Texas litigation. Balli also never explains why this alleged "re-loan" has any effect on the requirement that all deposits into the lockbox account be used to reduce the Trade Payables. Balli merely alleges its argument in the Texas litigation, that the funds were loaned again and remain due. But even if they were "re-lent", repayment would be due from the persons to whom they were loaned. In this case, Balli alleges that the new "loans" were made to Denro and SPU, not JISCO, the original debtor on the Trade Payables. Thus, JISCO could not be the debtor on the "re-loan" of the proceeds.

Moreover, this contention simply is not true. At no time did anyone – including Balli – treat Balli's cash contributions as a "loan", and the evidence that does exist contradicts this position. There are no loan papers, loan disbursement notes or any contemporaneous documents of any type in which either party records Balli's joint venture contributions as "loans". Nor did KST send Jindal monthly statements of loan activity, as required by the very loan agreements KST relies upon. Balli's own internal accounting evidence does not record these contributions as "loans" that could be subject to the Loan Agreement. Not once did the parties ever suggest, in any form, that Balli's contributions were loans at all, much less loans under the agreement entered into with Foothill. Balli simply invented this story for this arbitration and the Texas litigation.

KST and its Balli affiliates needed no document saying they could lend money to Jindal, if they chose to do so in their discretion. They could always do so or not, at their discretion. But that still does not abrogate the parties' agreement that liquidation of Jindal's pre-joint venture assets would go to reduce Jindal's pre-joint venture debt. As soon as the funds were received by KST, they reduced the Trade Payables.

Moreover, KST could probably not have done what it claims. KST's discretion was not unfettered, as the guarantor, Klöckner & Co., would not have permitted KST to use the lockbox proceeds for purposes other than the reduction of the guaranteed debt.

Finally, what KST or its Balli affiliates did with the funds they received from Jindal's pre-joint venture assets is irrelevant to whether they served to pay down Jindal's debt to KST. The bases for Balli's right to have the proceeds paid into the lockbox were the security agreements covering the Trade Payables and the Foothill Loan. As a result, once funds from the liquidation of the security came into KST's possession, the debt secured by those assets was reduced, and they became KST's funds to dispense as KST pleased. KST could pay them to Klöckner & Co., KST could transfer them to London for whatever purposes, or – as in fact happened – KST could use them to provide the promised capital for the joint venture. Balli's own records reflect that they were transferred to Denro and SPU as payment of tolling fees or advances on tolling fees. That they were lost and who is liable for that loss are issues for the trial in Texas, not this proceeding.

KST also argues, to the extent that Jindal understands it, that proceeds of the liquidation of pre-joint venture inventory were to be treated as sales in the context of the joint venture

(meaning that KST would get a share of the proceeds as "profit" before they were applied against debts), not as liquidation for the purposes of reducing debt.

KST's position is assumed, without any explanation, and no evidence is cited. The reasoning is moreover conclusory, relying on this statement: "GT correctly concluded that all proceeds from sales of pre-existing inventory of Denro and SPU were to be combined with the proceeds from joint venture sales." No Balli business person testifies that it was the intent of the parties that Jindal contribute its pre-existing inventory to the joint venture. In fact, the evidence demonstrates that Grant Thornton reached an erroneous conclusion.

From the 2001 MoU forward, liquidation of Jindal's pre-joint venture inventory was treated differently from the anticipated sales of joint venture products. Balli did not set up the separate lockbox for proceeds from inventory sales, as Beat Frei recommended. Nevertheless, STS's sales of Jindal's pre-joint venture stock were accounted for separately from STS's sales of joint venture products. As STS's CFO Jeff Sylvester explained the STS financial statements to Nasser Alaghband in December 2001:

"In the early stages of start up, the sales generated by STS were pure pass through of Jindal and SAW stock. The sales and related costs of goods sold cleared each other out to zero. An attempt to estimate and segregate this information from STS business is presented in these financial statements."

Sylvester's financial statements and explanation simply reflected the fact that this pre-joint venture stock was not provided by Balli, whose role was to provide raw material for the joint venture. This was material Denro had before the joint venture began. Moreover, as provided in the 2001 MoU and the 5 July 2001 Guaranty Agreements, Jindal's pre-joint venture inventory was burdened by KST's liens to secure payment of the Trade Payables. It was not to be contributed to the joint venture, but rather liquidated to pay down the debt it secured.

Beyond the early financial statements, STS continued to treat "pass through" sales of Jindal pre-joint venture inventory differently from sales of joint venture products. Indeed, throughout STS's contemporaneous income statements and balance sheets, "pass-through" sales are separated from joint venture sales, and STS's "pass-through" payables to Denro and SPU were kept separate from payables for tolling fees, which were recorded as "JV" payables.

Indeed, even after the joint venture failed, Balli made a formal presentation of its claims to P.R. Jindal in a 24 August 2003 meeting in London. As reflected in its presentation slides, Balli denied that the $8.6 million it received from sales of pre-joint venture inventory reduced the Trade Payables. Rather, Balli argued that "[t]his amount is reflected in both Jindal's and STS's accounts as being receivable by Jindal and payable to Jindal, respectively", i.e. their accounting acknowledges that the funds were for Jindal's account. There was no suggestion that these sales of pre-joint venture inventory were ever pulled into the joint venture and were but part of the joint venture profits and losses.

In light of this evidence, it is impossible to accept KST's new contention that it was entitled to "profit" on these "sales" and thus that they could not be applied to reduce the Jindal pre-joint venture debts. Grant Thornton's conclusion is nothing but revisionist history.

Jeff Sylvester, whom Balli authorized to transfer funds from the KST lockbox, directed Jindal to sell the inventory pledged to KST first through BKI, then STS. Sylvester was acting as KST's agent when he did so. Therefore, either (i) STS took the funds on KST's behalf, or

(ii) KST in effect directed Jindal to pay STS instead of KST. In either case, Jindal's debt to KST was reduced by the amount of funds KST's sister company took in from the sale of KST's collateral.

The proceeds from these sales of pre-joint venture inventory raised $8,748,051, which were applied to the pre-joint venture debts. The receivables placed another $5,760,572 in the lockbox. In total, liquidation of pre-joint venture assets raised $14,508,623. It is not a coincidence that, in the 2003 MoU, Balli specifically acknowledges that about $14 million has been paid on the Trade Payables. The new argument is another KST invention.

The applicable law supports JISCO's position. Under German law the parties in a creditor-debtor relationship are free to establish priority of payment among debts. Here the parties determined that the trade debts were the first priority for repayment from the liquidation proceeds. This is entirely consistent with JISCO's argument: the parties agreed on a specific application for the use of the liquidation proceeds.

KST makes this point in connection with its argument that the Conversion Agreements somehow abrogate the agreement to apply the liquidation proceeds to reduce the Trade Payables debt. There is, however, no evidence to support KST's apparent suggestion that the Conversion Agreements somehow supersede the 2001 MoU's records of the parties' agreement with regard to the liquidation proceeds.

The accounting to which KST refers – the GT Report – is a *post hoc* creation based entirely on a false premise invented for this arbitration. To summarize, KST now argues that payments Balli made for tolling fees or advances on tolling fees were in fact "loans" to Denro/SPU, and that repayment is now owed on them. STS's Jeff Sylvester at times would take money from the KST lockbox, as well as STS accounts, to fund the tolling operations. Balli's position is like someone telling a service provider, such as a tailor, that "I cannot pay you in full for your services, but I will lend you money from my sister's bank account, which you must repay with interest." KST now claims that it was entitled to apply the proceeds from the liquidation of the pre-joint venture assets to these subsequent "loans" rather than to the re-payment of the pre-joint venture debts, as the parties had agreed. KST's new claim that its cash contributions were actually "loans" is an issue in the Texas litigation, but for the purposes of the "accounting", KST takes it as given that its position in the Texas case is correct. This position is directly contradicted by all available evidence, including KST's own internal accounting documents.

There is not one piece of evidence that any party considered KST's contributions to the joint venture to be loans, and KST offers no evidence, reference to authority or other support of any kind for these naked assertions. KST has simply invented this theory for the arbitration. The GT Report is based on KST's mistaken "loan theory". It is apparently designed to show that KST has given credit for the proceeds, but to do so, GT must rely on KST's litigation position, which depends on the mistaken assertion that cash contributed by KST to the joint venture was a "loan" under the loan agreement that Denro had previously signed with Foothill. The evidence shows that this is not accurate.

But the GT Report, as well as KST's entire theory, depends on this, as without it, KST cannot support its claim that it could "in its sole discretion" apply the proceeds of the pre-joint venture asset sales to the alleged "loans". In effect, KST argues that by re-characterizing the payments and advances of tolling fees as "loans" and by claiming that these "loans" were

governed by the Foothill Loan agreements, it can then rely on those agreements to override the parties' express agreement on the use of the proceeds from the pre-joint venture assets and avoid the evidence, which directly conflicts with their desired outcome.

KST asserts that Grant Thornton has completed an accounting of the business activities of KST and Denro and that the GT report, dated 9 December 2005, provides "an accurate account of what remains due and payable". As stated in the Report of Richard W. Hoban, CPA, dated 24 February 2006 and filed in the Texas litigation, there were errors and inconsistencies in Grant Thornton's various analyses.

In fact, Grant Thornton has already attempted to correct at least one of those errors. Grant Thornton's "accounting" was made in a manner that did not verify its results against STS's own contemporaneous accounting, which was audited and approved by BDO Seidman, an independent international accounting firm. Instead of relying on audited records, Grant Thornton elected to re-construct STS's accounts itself and, in doing so, relied on incorrect or incomplete documentation rather than STS's own general ledger, the results of which were audited and approved by BDO Seidman. As a result, Grant Thornton's analyses and conclusions are flawed and should not be relied upon. Hoban concludes:

"Grant Thornton did not apply the credits properly and Grant Thornton's 'accounting' is not in accordance with the applicable provisions of the various agreements, nor the discussions, negotiations and intent of the parties."

Moreover, from the inception through the end of the joint venture, when the parties were notably not in litigation, STS viewed the accounting for the joint venture much differently than Grant Thornton views it today for litigation purposes. Grant Thornton offers no explanation as to why STS's contemporaneous accounting is improper or why it apparently ignored fully using STS's own accounting records. Instead, in applying its after-the-fact and selective interpretation of the various agreements, Grant Thornton has produced a revisionist accounting that is apparently developed to advance KST's litigation goals.

With respect to pre-joint venture receivables, Hoban concluded that subsequent KST advances were related to joint venture operations and were not "loaned back" to Jindal. The firm FTI Consulting, Inc. observes that cash is fungible and once collected by KST and applied to reduce the Jindal debts, KST chose to use such funds to make advances to Jindal for joint venture operations. Hoban supports his conclusions with the fact that (a) Grant Thornton's logic for inclusion was faulty, (b) neither KST nor Grant Thornton can point to any logical business reason or contemporaneous document stating such advances were being "loaned back", (c) there is evidence reflecting that joint venture advances were being made by KST, and (d) the timing and amount of the collections of the pre-joint venture receivables do not support the contention that subsequent advances were "loans".

*Have the Trade Payables been rescheduled?*

In addition to KST, Denro owed Thyssen, Mitsubishi, Leman and EuroAsia for slab purchases. These were the debts that KST and Balli committed to restructure, but did not. All have been satisfied by Jindal, except for Thyssen, with whom Jindal is continuing to negotiate.

When Vahid Alaghband was attempting to convince Indresh Batra to sign the Security Agreement in early July 2001, he committed to reschedule the Trade Payables, even if the

other creditors did not go along. In a 2 July 2001 e-mail to Herman Koegler of Klöckner & Co., Vahid Alaghband recounted:

> "Jindal management originally stated on Friday that the Saw Pipes pledge should happen at the same time as the official rescheduling of the $22.8 million debts. This is correct and the MOU with Mr Jindal creates a connection between the pledge and the rescheduling. However, we convinced Mr Batra on Friday night that he should issue the pledge now and in advance of the rescheduling. He accepted my verbal assurance that although we could not guarantee the approval of the rescheduling from the other creditors' side, we would, subject to Hermes approval, do a KST rescheduling."

On 29 November 2001, Nasser Alaghband on behalf of KST signed the Fourth Amendments to the Loan Documents and Forbearance Agreements with Denro and SPU. In Section 6 of the Fourth Amendments, KST as Lender agreed to reschedule the Trade Payables until 31 December 2008.

In April 2002, Balli had still made no progress in restructuring the debts Jindal owed to other creditors. Those creditors – particularly Mitsubishi – lost interest when Balli retracted its commitment to allow all creditors to share *pari passu* in the security interests KST had taken in the Denro and SPU assets.

On 4 April 2002, Nasser Alaghband on behalf of KST signed the Fifth Amendments to the Loan Documents and Forbearance Agreement with Denro and SPU, again agreeing that if Balli did not restructure the debts Jindal owed to other creditors and did not believe in good faith at the end of the forbearance period they could do so, then KST would restructure Jindal's obligations to KST, including the $22.8 million Trade Payables owed by JISCO, through 31 December 2008.

In the Fourth and Fifth Amendments to the Forbearance Agreement with both Denro and SPU, KST committed that if Balli failed to convince Jindal's other creditors to reschedule Jindal's debts to them, KST would reschedule Jindal's obligations to KST with an amortization schedule extending through 31 December 2008.

There is no dispute that KST and its Balli affiliates failed to achieve a rescheduling of any of Jindal's other debts – principally because Balli reneged on its representation that it would allow Jindal's other creditors to participate *pari passu* in the security interest KST obtained in Denro's and SPU's assets.

When asked why KST had not then rescheduled its own debt pursuant to the Amended Forbearance Agreement, Nasser Alaghband, who signed the Amendments on behalf of KST, testified he did not know.

KST now disavows its commitment, saying that the Amendments to the Forbearance Agreement were not made with JISCO, but rather Denro.

KST's inequitable argument fails, because the Amendments themselves expressly define the "Obligations" that KST committed to reschedule as including the $22.8 million Trade Payables owed by JISCO.

KST may argue that its agreement to reschedule the Trade Payables is subject to the approval of KST's credit insurer Hermes, and that Hermes has not approved the rescheduling. But KST

has submitted no evidence that it ever asked Hermes in good faith to approve the rescheduling.

KST's failure to act in good faith to secure Hermes's approval precludes KST from invoking that condition to excuse its failure to perform. The Amendments to the Forbearance Agreement provide that they are governed by New York law. Under New York law, KST cannot rely on another party's failure to perform a condition precedent to discharge its own obligation to perform when KST frustrated or prevented the occurrence of the condition.

In *Cauff*, an airplane brokerage firm sued an airline subsidiary for breach of an aircraft sales and financing agreement. The contract required defendant's parent company to approve the contract and guarantee the loan. The defendant claimed that because its parent did not approve the contract, it owed no obligations to the plaintiff. The court, however, ruled in favor of the plaintiff based on the "doctrine of prevention" and the duty of good faith implicit in all contracts under New York law (807 F. Supp. at 1022-1023).

The court explained that under the "doctrine of prevention" when a party prevents the occurrence of a condition precedent, then that condition is excused. The court noted that the "doctrine of prevention" is substantially related to the implied covenant of good faith and fair dealing that is implicit in every contract. According to the implied covenant of good faith, the promisor must facilitate the occurrence of a condition precedent by "either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence". The court excused the condition precedent that required the defendant to obtain approval from its parent pursuant to the "doctrine of prevention" because the defendant did not even attempt to seek approval from its parent despite its good faith duty to do so, and the court would not allow the defendant to escape its obligations under the contract merely by failing to take the steps necessary to obtain approval by its parent company. The court stated:

"Where the occurrence of events leading to the performance of a condition precedent is under the control of the defendant, the defendant cannot rely on the non-occurrence of the condition to defeat its contractual obligations."

In this case, had KST in good faith asked Hermes to approve KST's extension of the Trade Payables, there would have been no good reason for Hermes to say no: KST's only option then would be to declare the debt in default and file a claim on the Hermes policy immediately.

It is not disputed that KST agreed that, if it did not succeed in getting Jindal's other creditors to reschedule the debts Jindal owed them, then KST would restructure its own debt – expressly including the Trade Payables – on an amortization schedule through 31 December 2008, subject to Hermes's approval.

KST nonetheless disputes that its restructuring covenant applies in this proceeding, because *inter alia* the parties' agreement, although it expressly refers to the Trade Payables, was signed with Denro and SPU, rather than JISCO. KST argues that there was no amortization schedule, thus making the covenant unenforceable, but it neglects to inform the Arbitral Tribunal that the amortization schedule was only required if Balli failed to secure a global restructuring and that KST was responsible for producing the amortization schedule, which it failed to do.

KST covenanted to restructure Jindal's debts, including the Trade Payables, through 2008, regardless of whether other creditors rescheduled. In this respect, KST similarly tries to escape an agreement, this time to avoid the effects of the Forbearance Agreements, which clearly require KST to reschedule the Trade Payables debt through the end of 2008. Here, too, KST's arguments are litigation positions, not supported by the facts or the parties' practices prior to this arbitration.

When referring to the fact that JISCO was not a party to the Forbearance Agreements, and thus cannot benefit from the agreement to forbear, KST essentially argues that the Forbearance Agreements do not apply to the Trade Payables. Here, KST is mistaken, most notably because the Forbearance Agreements specifically include the Trade Payables as among the debts to be rescheduled.

KST then claims that the covenant to extend the due date of the Trade Payables was conditioned on approval from Hermes, which KST claims it did not get.

KST represented that it had the contacts and ability to restructure Jindal's outstanding debt with all creditors, and charged Jindal an advance fee of $500,000 to do so. Moreover, Vahid Alaghband promised Indresh Batra that, if the restructuring could not be accomplished, he would return Jindal's Texas assets to their pre-joint venture unpledged status quo. Finally, in the Fourth and Fifth Amendments to the Forbearance Agreement, KST covenanted that if they did not succeed in getting Jindal's other creditors to agree to a restructuring plan, then KST would restructure Jindal's obligations to KST on an amortization schedule extending through 31 December 2008.

Through the fall of 2001, KST – through Beat Frei – held out to other creditors the promise of a share in the security interests in the Denro and SPU assets. This is what KST represented to Hermes in securing its approval of an overall restructuring. In a letter of 5 September 2001, which Beat Frei asked Axel Kopp, KST Managing Director, to send to Mr. Koch of Hermes, KST advises Hermes:

"Die Jindal Gruppe ist bereit, sämtliche unbelasteten Vermögenswerte der US Denro (Blechwerk) sowie Saw Pipes USA Inc. zu Gunsten der Gläubiger auf einer Pari passu Basis zu verpfänden."

(English translation: "Jindal group is prepared to pledge all freely available assets of US Denro and Saw Pipes USA Inc. in favor of the creditors on a *pari passu* basis.")

On 23 October 2001, as the parties were negotiating the terms of the Master Plate and Master Pipe Agreements, Batra reminded Frei about Vahid Alaghband's promise to return to the status quo if the restructuring and other matters contemplated by the 2001 MoU could not be accomplished. Frei responded: "As far as I recollect - - - if the MoU can not be executed as we both plan, then both parties will reestablish the status quo prior to the MoU." However, Frei continued, many actions had taken place since the MoU, including the Foothill takeout and the infusion of working capital. Moreover, he wrote:

"Also we have made it clear in all discussions with the creditors that they will share in the security if an [sic] when they come to the club of creditors. If we put any language in the agreements that might dilute this, we will not be able to achieve this rescheduling, especially with Baker Boots [sic] representing Mitsubishi!!!"

But after Frei was recalled from Baytown and sent to Germany to oversee the Klöckner finances (where he discovered the illegal transfers that would lead to the convictions of Vahid and Hassan Alaghband), KST reneged on the *pari passu* concept. In May 2002, KST decided

to eliminate the *pari passu* sharing of the Jindal security and offer Mitsubishi only a second lien, subordinate to KST's liens. On 15 May 2002, Ferit Ferhangil, who replaced Frei in Baytown, wrote to Nasser Alaghband:

"The second lien - - - concept was cleared with Michael Baxter (bankruptcy specialist at Covington) before I raised the topic with Mitsubishi. So, from a legal standpoint, we are fine."

Ferhangil explained:

"We are certainly in much better shape than the security sharing arrangement that Beat had proposed, which would have put us pari passu with all the other creditors. Having the position of secured creditor (with effectively a first mortgage), we will be ahead of all other creditors in case of a bankruptcy. - - - In any event, if the proceeds from a sale or liquidation is less or equal to our claim, then the other creditors who have a second lien, will be classified as unsecured and they will get nothing."

But soon KST would take back even the second lien. On 12 August 2002, Ferhangil e-mailed the Alaghband brothers:

"I spoke to Mitsubishi before leaving Baytown. They are calm and are awaiting a term sheet from Balli - - -. They have been patiently waiting for more than a year now."

But Ferhangil let the brothers know he was preparing Mitsubishi for another bombshell when the term sheet did arrive:

"I have warned them that due to 'many creditors and banks being involved the term sheet changes by day', so that they are not shocked when they see that the second lien has disappeared."

Not surprisingly, Mitsubishi gave up on working out a global rescheduling with KST. On 28 March 2003, Anath Iyer of Mitsubishi e-mailed Rahlon:

"Despite the best efforts of all concerned we have not seen much progress on the plans for repayment of Mitsubishi's receivables from [Denro]. The efforts by BK through STS has not seen any progress so far as our issues are concerned – with practically no progress since we last called on you in November 2002."

Therefore, Mitsubishi gave notice to Jindal that it had given up on the global restructuring and "have now decided on factoring our receivables with a suitable financial institution". Indresh Batra forwarded the e-mail to KST's Jeff McCarthy with the understated comment that "it looks to me serious".

Having killed the chances of a global restructuring by reneging on the promise that creditors would share in the Jindal security *pari passu*, KST then reneged on its promise to Jindal to restructure its own receivables. As KST today admits, it never sought Hermes's approval for the stand-alone restructuring. The reason KST never asked should be apparent: Hermes would have said "Yes", had KST asked in good faith. At worst, Hermes would not have to pay on a claim on the credit insurance policy until 2009. At best, the debt might be repaid by then. If Hermes said no, the debt would be declared in default and Hermes would have to pay up on the credit insurance policy.

It would be as if a New Orleans homeowner in the wake of Hurricane Katrina asked his insurance company to give him two years to see if the U.S. government would rebuild his home, so that he would not have to make a claim. Of course the insurance company would allow him the extension.

Jürgen Vogt is a German credit insurance broker who worked for Hermes for 7 years. He testifies:

"Based on my experience in the German credit insurance business, including many years at Hermes, it is my opinion that if KST had asked Hermes in good faith to approve a restructuring of the Obligations, including the US$22.8 million that Hermes insured, Hermes would have checked the financial status of the borrower, but would have approved such a restructuring, because to do so would be in Hermes' financial best interest.

First, by approving the restructuring, Hermes would have put off the day – until at least 31 December 2008 – it would have to pay on the credit insurance policy covering the US$22.8 million payables. Indeed, if the restructuring succeeded, Hermes would not have to pay anything on the policy. If Hermes refused to approve the restructuring, Hermes would have to pay on the credit insurance policy immediately.

Second, during the restructuring, Hermes would earn additional premiums on the credit insurance policy. Collecting such premiums is the way Hermes makes its money.

Therefore, in my opinion, if KST had asked Hermes in good faith to approve a restructuring of the Obligations, including the US$22.8 million that Hermes insured, Hermes would have approved such a restructuring."

Of course, in reviewing the Jindal financial situation, Hermes would see foremost that KST was, in the words of Ferit Ferhangil, in "the position of secured creditor (with effectively a first mortgage)" on Jindal assets (including the pipe mill) worth far more than the $22.8 million Hermes had insured. Because Balli reneged on the *pari passu* sharing of the security, no other Jindal creditor could touch those assets before KST. There would be nothing to lose and much to gain in agreeing to the stand-alone restructuring – had KST only asked in good faith.

As a result of KST's failure to seek approval from Hermes to reschedule KST's debts insured by Hermes, the doctrine of prevention operates to bar KST's reliance on the failure to get approval from Hermes.

KST also asserts that the Forbearance Agreements "were not contracts" because they were "so vague as to be unenforceable". KST's real complaint appears to be that no amortization schedule was ever agreed upon and, therefore, that the Forbearance Agreements cannot be enforced. KST is also confusing the primary goal of the parties – restructuring all of Jindal's debts with its creditors – with the fall-back, or alternative position, restructuring only the KST debts. The amortization schedule only became an issue if KST failed to obtain the promised global restructuring.

It is undisputed that KST agreed to restructure the Trade Payables with an amortization schedule extending to 31 December 2008. This applied in the event that no global restructuring was achieved.

KST alleges that no amortization schedule was agreed because Jindal "did not believe a final agreement had been reached". KST attributes this to P.K. Rahlon. The timeline of events demonstrates, however, that KST's argument is disingenuous. First, as noted, the amortization schedule became an issue only because KST sabotaged the global restructuring. Second, it was KST's responsibility to propose an amortization schedule, not Jindal's. There is no evidence that KST ever did so.

Furthermore, Mr. Rahlon flatly denies this allegation. The Forbearance Agreements were a key element of Jindal's efforts to preserve the parties' joint venture and their own viability. At no time did they consider that the Forbearance Agreements were not final agreements.

is illogical to assume that Jindal would have thought this and not immediately attempted to resolve the problem. As there is no evidence that Jindal "did not believe a final agreement had been reached", this conclusion must be rejected.

Finally, KST's argument that "the agreement to reschedule the Trade Payables was so vague as to be unenforceable" is contrary to both law and common sense. First, the nature of the agreements, and the fact that there had been multiple amendments, flatly contradicts the claim that they were somehow too ambiguous to be relied upon. KST engaged in negotiations and executed amended agreements, and it defies logic to assume that KST did this while believing that the agreements were illusory.

Second, New York law is clear that an agreement may omit even substantial terms and still be enforceable. In *Point Developers, Inc. v. FDIC*, a loan agreement was held enforceable even though it did not specify the term of the loan, the repayment schedule, or the amortization schedule – 921 F. Supp. 1014, 1021-22 (E.D.N.Y. 1996) (RLA-54). New York courts disfavor setting aside an agreement on the grounds of indefiniteness, stating that this approach should be taken only as "a last resort" – *see Marshall Granger & Co., CPA's, P.C. v. Sanossian & Sardis, LLP*, 15 A.D.3d 631, 632 (N.Y. App. Div. 2005)(RLA-55).

### KST:

JISCO does not deny that Denro and SPU were in fact advanced funds by KST and that they remained obliged to repay the full balance of the Foothill Loan. JISCO argues that, notwithstanding the obvious fact that KST did in fact advance these funds to Denro and SPU for their operations, this was contrary to an alleged understanding between KST and Klöckner & Co. Regardless of the opinion of Klöckner & Co. as to whether KST should have been reloaning such funds back to Denro and SPU, that is what in fact happened. Moreover, in an e-mail dated 20 September 2001 to Mr. Jeff McCarthy, Mr. Oberhuber of Klöckner & Co. acknowledged that he was aware that receipts of receivables which had been deposited in a KST controlled lockbox account were going to be re-advanced to fund the operational needs of Denro and SPU.

JISCO states that $8.8 million from the sale of inventory of Denro and SPU was deposited into the KST lockbox account. This is incorrect. Pursuant to the Conversion Agreements, STS sold steel plate and pipe to third-party customers. The plate and pipe were milled by Denro and SPU from steel slabs applied by STS. The Conversion Agreements contained a formula for the division of profits. During the course of the Conversion Agreements, STS would typically submit a customer's order to either Denro or SPU (depending on whether STS had sold steel plate or steel pipe, so the order could be processed). From time to time, Denro or SPU would submit an invoice to STS (not KST) for portions of the sales to customers which, according to them, included their inventory as well as the inventory of STS. The aggregate amount of the invoices received by STS from Denro and SPU was approximately $8.5 million. Although Denro and SPU never provided STS with documentation supporting these invoices, STS credited them with all such amounts in STS's accounting of the transactions between them.

As part of its review of the financial affairs between KST, on the one hand, and Denro and SPU, on the other, Grant Thornton analysed the formula in the respective Conversion Agreements for determining the amount of production costs Denro and SPU were entitled to receive and the amount, if any, of "profit" which could be distributed to KST and the other

trade creditors. Grant Thornton correctly concluded that all proceeds from sales of pre-existing inventory of Denro and SPU were to be combined with the proceeds from the sale of STS's inventory. Therefore, the sales of inventory by STS have been properly accounted for pursuant to the Conversion Agreements, and JISCO is not entitled to a credit.

JISCO states that German law provides that payment by a guarantor extinguishes the principal debtor's obligation to the creditor. This proposition is certainly reasonable and is consistent with American law, which in general precludes double recoveries. However, JISCO greatly oversimplifies the issues. If the only obligation between the parties was the Trade Payables, then clearly any payment received by KST would be credited against the Trade Payables. However, there were several payment obligations by Denro, SPU and JISCO, thus giving rise to a question of which obligation should be credited first with a payment. JISCO entirely ignores the language of the various agreements and essentially contends it is entitled to determine which obligation should be credited with payments without reference to the parties' agreements. German law specifically allows the creditor and debtor to agree on which debt should be paid, and the debtor's later request that a payment be credited in an inconsistent manner is of no effect. Further, German law does not apply to the Loan Agreements or to the Conversion Agreements. Because KST and STS are operating under the Loan and Security Agreements and the Conversion Agreements in calculating the amounts due under those agreements and the appropriate treatment of credits, German law has no application to those calculations.

KST and Grant Thornton, on the other hand, have expressly analysed all the relevant agreements between the parties. The $8.8 million in inventory was sold by STS or its predecessor in accordance with STS's authority under the Conversion Agreements. Therefore, to determine the proper accounting treatment for the inventory, the parties and the Arbitral Tribunal must analyse the agreed accounting treatment in the Conversion Agreements. The GT Report does so, but JISCO does not. Likewise, the $5.7 million in proceeds from the receivables were re-lent to Denro and SPU pursuant to Sections 1.1(a), 3.1 and 4.3 of the Loan Agreements, which provide that the receivables are security for the revolving loan, allow KST discretion in applying proceeds of collateral, and allow funds to be re-lent to the borrower. Again, the GT Report takes these provisions into consideration in its analysis of the proceeds of the receivables, but JISCO does not.

JISCO claims Balli "raided" the lockbox account to pay for the joint venture and other business ventures. The basis of this allegation is not entirely clear. The lockbox was set up for payments on the Loan and Security Agreements, which were revolving loans. These loans, therefore, expressly authorized funds to be re-lent, and they were. Again, JISCO has failed to identify any provision of any loan or other agreement that precludes funds from the lockbox from being re-lent or which require the lockbox funds to be credited to the Trade Payables without taking additional advances into consideration.

JISCO has been provided with all of the records from the lockbox account and, accordingly, is well aware that all of the funding from that account went to either Denro or SPU. The allegation by JISCO that an unspecified Balli entity withdrew funds from the lockbox account in connection with the acquisition of Klöckner & Co. is completely false. Moreover, as JISCO has copies of all of the records of the lockbox account, it should full well know that this allegation is completely untrue.

JISCO's arguments regarding the alleged forbearance on the Trade Payables seem disingenuous, at best. Neither KST nor any related company agreed that no payments of any kind needed to be made on the Trade Payables until 2008. Quite the contrary, Denro, SPU and KST entered into the Fifth Forbearance Agreements in which they agreed they would reschedule payments on the Trade Payables so that they would be fully paid by 2008 if several conditions precedent occurred. As no one has made a single payment on the Trade Payables since long before the execution of the Fifth Forbearance Agreements, and JISCO clearly has failed to comply with any anticipated payment schedule, JISCO hardly seems in a position to contend that the Trade Payables are not in default, which would preclude KST from collecting. On the contrary, they are clearly in default, giving rise to an immediate repayment obligation which is the subject of this arbitration.

Moreover, the agreement to reschedule the Trade Payables was so vague as to be unenforceable, even if the condition had been met. Likewise, it has not been explained why neither Denro nor SPU, the parties seeking additional debt forbearance, ever submitted an amortization schedule or tendered a good faith payment. The reason is obvious. JISCO's representative, Mr. Rahlon, apparently did not believe a final agreement had been reached. He testified in his deposition that he believed that the amortization would have called for quarterly payments but that no such payments were tendered because "[t]he documents have to be signed before we start working on that". It should also be noted that JISCO submitted no evidence of any follow-up between the parties regarding the alleged agreement to amortize over a six-year period.

KST did attempt to obtain the approval of Hermes to the debt rescheduling. In fact, not only did KST contact Hermes to seek its approval, KST did actually obtain Hermes's conditional approval. In an e-mail dated 14 July 2002 from Ralph Oberhuber to Beat Frei, Mr. Oberhuber advised that Hermes had agreed to the rescheduling provided that all of Denro's other trade creditors also agreed. Similarly, in a letter dated 23 July 2002 from Mr. Oberhuber to Mr. Werner Daniel of ThyssenKrupp, another creditor, Mr. Oberhuber advised that Hermes's approval of the restructuring of the debt to JISCO was conditioned upon the agreement of all creditors "with the business plan". It is undisputed, however, that such other creditors (namely Thyssen, Mitsubishi and EuroAsia) never reached a unified position on an overall debt rescheduling plan. Accordingly, Hermes did not agree to a unilateral re-structuring of KST's debt through 2008. The cases cited by JISCO on the "doctrine of prevention" have no application because KST unquestionably attempted to comply with the condition precedent to obtaining Hermes's approval.

JISCO has falsely implied that KST did not make a good faith effort to assist Denro in negotiating a rescheduling of its trade debts. KST spent an extensive amount of time assisting Denro to achieve a restructuring plan with its other major creditors, even though there was no agreement binding it to do so. Neither JISCO, Denro nor SPU ever paid the $500,000 fee which had been discussed. Although this amount was at one time debited against Denro's balance on its loan, KST has since decided not to charge such fee. As can be seen by the GT report, the restructuring fee is not included anywhere in the calculations of the amounts owed by Denro or SPU to claim it. This claim by Denro or SPU is, in any event, not relevant to this arbitration proceeding.

The 2001 MoU specifically states in Sections 1 ("intend to negotiate - - an effort to enter into mutually satisfactory definitive agreements") and 7 ("intended to indicate the current

intent of the parties and is not intended to constitute a binding obligation of the parties") that, in so far as relevant to this arbitration, it is not a binding contract.

Moreover, although the 2001 MoU indicated that the parties might form a "joint venture" at some point in the future, it expressly did not create any such relationship at that time. Therefore, it is clear that no joint venture was created by the execution of the 2001 MoU.

JISCO implies that the 2003 MoU also constituted a binding contract. However, the 2003 MoU also merely set forth the intent of the parties regarding the future of the workout arrangement, subject to being documented, but did not create binding obligations on the part of any of the parties.

In the jurisdictional phase of this proceeding, JISCO similarly took the position that the 2003 MoU was a definitive contract which served to release JISCO from its payment obligations under the original trade agreements. The Arbitral Tribunal rejected that argument and noted that the 2003 MoU "was a document only reflecting 'the intent of the parties'." (the Arbitral Tribunal's 8 July 2005 Decision, p. 17).

### (b) Party substitution

### KST:

In parallel with the present arbitration, merger proceedings were going on between, essentially, JISCO and its parent company JVSL, subsequently renamed JSW Steel. The merger proceedings resulted in the extinction of JISCO and the global transfer of rights and obligations, pending and actual, to JVSL. According to the Scheme of Arrangement and Amalgamation ("the Merger Plan"), it was the duty of JVSL to take the necessary steps to transfer all pending claims against JISCO "into its name and to have the same continued, prosecuted and enforced by or against JVSL to the exclusion of JISCO". JVSL/JSW Steel failed to comply with this term of the Merger Plan. Since an award against the now defunct JISCO would in all likelihood not be enforceable against JSW Steel, it is of the utmost importance that JSW Steel be substituted for JISCO as the Respondent in the Final Award.

It is a fact that Respondent – although having been identified as JISCO – since the inception of this arbitration in April 2004 has been, conditionally, a company referred to as JVSL in the Merger Plan. Since the relevant courts' approval of the Merger Plan in February 2005, JVSL's partisanship in this arbitration has become unconditional and final.

It should be noted that according to a clause in the Merger Plan JVSL's name was to be changed to JISCO but that in reality JVSL changed its name to JSW Steel. This would seem to represent a departure from the terms of the Merger Plan but should not be susceptible of obscuring the matter of the corporate identity of the Respondent.

Any notification to the Arbitral Tribunal of the necessity to substitute JSW Steel for JISCO does not have any constitutive effect or any other legal consequences. It is simply so that the Arbitral Tribunal – by sheer practical necessity – must be apprised of the consummation of the Merger Plan for purposes of making the appropriate amendments in relevant orders and awards. It is, not surprisingly, the duty of JSW Steel into which JISCO has merged to notify the Arbitral Tribunal hereof pursuant to the Merger Plan, but JSW Steel has reneged on this obligation.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

*JSW Steel:*

Respondent will stipulate as follows:

"Respondent stipulates that JSW Steel, Ltd., formerly known as Jindal Vijaynagar Steel Ltd. and into which Jindal Iron & Steel Co. Ltd. (JISCO) was merged, may be substituted for JISCO as the respondent in any award the Tribunal may issue. This stipulation is subject to and without waiver of any objections JISCO has to the jurisdiction of the Tribunal, which objections may be asserted by JSW Steel, Ltd."

## 5. Reasons

### *(a) The Arbitral Tribunal's jurisdiction*

In five order confirmations issued during the period February-July 2000 and addressed to JISCO, KST confirmed having sold steel slabs for direct export and consumption in the USA. The order confirmations contained the following arbitration clause:

"ARBITRATION
THE PARTIES WILL ENDEAVOR TO THE FULLEST EXTENT TO SETTLE ANY CONTROVERSY ARISING OUT OF THE PRESENT CONTRACT IN ANY MANNER. IN CASE IT IS NOT POSSIBLE TO FIND AN AMICABLE SETTLEMENT, THEN THE CONTROVERSY WILL BE RESOLVED THROUGH ARBITRATION TO BE CONDUCTED IN ACCORDANCE WITH THE CONCILIATION AND ARBITRATION RULES OF THE INTERNATIONAL CHAMBER OF COMMERCE. THE DECISION OF THE ARBITRATORS SHALL BE FINAL AND BINDING ON THE PARTIES. ARBITRATION BE HELD IN STOCKHOLM IN ACCORDANCE WITH SWEDISH LAW."

During the period April-October 2000, KST issued seven invoices, addressed to JISCO, regarding steel slabs which had been delivered to Denro in accordance with the order confirmations. The sum of these invoices was $23,460,310.53 out of which an amount of $640,000 has been paid. In the present arbitration, KST claims payment of the remaining amount of US$22,820,310.53 (*"the Trade Payables"*).

During the present arbitration, JISCO requested that the Arbitral Tribunal declare that it has no jurisdiction over the claims in this case. JISCO argued, *inter alia*, that there had been an assignment of claims from KST to the company Stanhope Services GmbH and that the debtor was not JISCO but Denro. JISCO further stated that the lawyers purporting to act on behalf of KST apparently had not been granted authority to do so.

The Arbitral Tribunal decided to examine separately the following four jurisdictional issues:

"(a) Has the legal title to the Trade Payables been assigned by Claimant to [Stanhope Services GmbH] (or to any other creditor) and, if so, is the result of such assignment and the manner in which it was effected that Claimant lacks standing to act as claimant in this arbitration?

(b) Has counsel for Claimant been given proper authority to act as counsel in this arbitration?

(c) Was [Denro] and not Respondent the buyer of the steel slabs and, if so, does that make Respondent the wrong defendant in this arbitration?

(d) If the buyer of the steel slabs was Respondent, has the obligation to pay for the slabs been transferred to [Denro] (or to any other debtor) in such a manner as to make Respondent the wrong defendant in this arbitration?"

In its Decision of 8 July 2005, the Arbitral Tribunal found in essence:

(a) that the Trade Payables had not been assigned to Stanhope Services GmbH or to any other company,

(b) that counsel for KST had been given proper authority to act for KST,

(c) that JISCO, and not Denro, was buyer of the steel slabs, and

(d) that the obligation to pay for the steel slabs had not been transferred to Denro or to any other company.

The reasons for these findings, which are set out in detail in the Decision of 8 July 2005, may be summarized as follows:

*As to (a)*
According to an agreement of 7 August 2001 – the so-called KST/SKI Agreement – a structure and a mechanism were to be created for the liquidation of the Trade Payables and certain other receivables. The company Stanhope Services GmbH was set up for the purpose of assisting in this liquidation.

In a subsequent agreement of 15 October 2001 – the so-called Assigment Agreement – certain rights were assigned by KST to Stanhope Services GmbH. However, the parties did not agree on whether the legal title to the Trade Payables or only more limited rights were assigned in the Assignment Agreement. On the basis of an analysis of the Assignment Agreement and the circumstances surrounding it, the Arbitral Tribunal found various elements which supported the view that KST did not transfer the legal title to the Trade Payables and considered that in any case JISCO had not shown that KST had lost its capacity as creditor in respect of the Trade Payables.

*As to (b)*
Having regard to the fact that JISCO no longer maintained its original argument that counsel for KST lacked proper authority, the Arbitral Tribunal found that he had been given such authority.

*As to (c) and (d)*
The Arbitral Tribunal noted that the purchase orders and other documents indicated JISCO as the buyer and found that there was no evidence showing that despite this documentation KST would have considered JISCO not to be a party to the sale transactions. Moreover, in a number of subsequent documents JISCO continued to be named as debtor in respect of the Trade Payables, and the Arbitral Tribunal did not find it established that KST ever released JISCO from its payment obligations under the original purchase agreements.

The Arbitral Tribunal finds no reason for modifying its conclusions on these jurisdictional issues, as expressed in the Decision of 8 July 2005. No further jurisdictional objections having been raised by the parties, the Arbitral Tribunal now finds itself competent to examine the present dispute on the basis of the arbitration clauses in the order confirmations which are to be considered as agreements between KST and JISCO.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

### (b) The scope of the present dispute

The two main questions which the Arbitral Tribunal is called upon to examine in this award are:

– whether the amount of the Trade Payables has been reduced as a result of the liquidation of Denro's and SPU's receivables and inventory on the basis of certain agreements between the Balli companies and the Jindal companies, and

– whether the payment of the Trade Payables, or of any remaining part of the Trade Payables, has been rescheduled pursuant to an amortization schedule ending on 31 December 2008 with the effect that there is no obligation, at the present time, to pay this debt.

In order to answer these questions, the Arbitral Tribunal finds it necessary to analyse certain events which occurred after the delivery of the steel slabs in 2000 and to examine what legal conclusions can be drawn from these events.

### (c) General background

The Arbitral Tribunal notes that in May and June 2001 representatives of the Balli Group and the Jindal Group met in order to discuss forms of co-operation which would make it possible for Denro and SPU to resolve their economic problems and for KST to obtain payment for the Trade Payables. As a result of these discussions, the Memorandum of Understanding of 8 June 2001 *("the 2001 MoU")* was signed by KST and other Balli companies, on the one hand, and by JISCO, Denro, SPU and other Jindal companies, on the other hand.

The 2001 MoU provided that:

– the Balli companies were to alleviate the economic burden of the Jindal companies by taking over Denro's and SPU's loans from the Foothill Capital Corporation *("the Foothill Loan")* and by rescheduling the Trade Payables,

– the Balli companies were to be given further security for the Trade Payables by having JISCO's debt guaranteed by Denro and SPU, and

– the parties were to engage in a joint venture in respect of delivery and processing of steel slabs and the sale of steel plate and steel pipe, the proceeds of which were to be used, *inter alia*, for repayment of the restructured indebtedness to KST and other Balli companies.

The 2001 MoU was not a binding agreement but reflected the intention of the parties to negotiate in good faith between themselves and with third parties in order to enter into mutually satisfactory agreements. Further contacts between the parties resulted in the following legally binding undertakings:

(a) KST took over the Foothill Loan and thus became Denro's and SPU's creditor in respect of this Loan *(Assignment and Assumption Agreement of 5 July 2001)*.

(b) SPU became guarantor of, and pledged security for, the Trade Payables *(Guaranty and Security Agreement of 5 July 2001, cf. also Third Amendment to Loan Documents and*

*Forbearance Agreement and Amendment No. 3 to Loan Documents and Forbearance Agreement of the same date).*

(c) KST undertook to forbear from exercising its rights as creditor in regard to the Foothill Loan until 19 August 2001 (*Third Amendment to Loan Documents and Forbearance Agreement, Amendment No. 3 to Loan Documents and Third Forbearance Agreement*), 13 March 2002 (*Fourth Amendment to Loan Documents and Forbearance Agreement, Amendment No. 4 to Loan Documents and Forbearance Agreement*) and 14 June 2002 (*Fifth Amendment to Loan Documents and Forbearance Agreement, Amendment No. 5 to Loan Documents and Forbearance Agreement*).

(d) KST undertook, on certain conditions and subject to the approval of Hermes Kreditversicherungs-AG (*"Hermes"*), to reschedule its rights under the Foothill Loan and the Trade Payables according to an amortization schedule ending on 31 December 2008 (*Fifth Amendment to Loan Documents and Forbearance Agreement, Amendment No. 5 to Loan Documents and Forbearance Agreement*).

(e) Denro and SPU mutually guaranteed each other's obligations under several of these agreements (*Third Amendment to Loan Documents and Forbearance Agreement, Amendment No. 3 to Loan Documents and Third Forbearance Agreement, Fourth Amendment to Loan Documents and Forbearance Agreement, Amendment No. 4 to Loan Documents and Forbearance Agreement, Fifth Amendment to Loan Documents and Forbearance Agreement, Amendment No. 5 to Loan Documents and Forbearance Agreement*).

(f) Steel slabs were to be delivered by STS and processed by Denro into steel plates which were to be sold by STS. The proceeds, after coverage of certain costs and certain funding, were to be divided between Denro (75%) and STS (25%), and the proceeds of Denro's share were to be used for the fulfilment of repayment obligations vis-à-vis creditors, including KST (*Master Plate Conversion Agreement of 29 November 2001*).

(g) Steel plates were to be delivered by or on behalf of STS and processed by SPU into steel pipes which were to be sold by STS. The proceeds, after coverage of certain costs and certain funding, were to be divided between SPU (75%) and STS (25%), and the proceeds of SPU's share were to be used for the fulfilment of repayment obligations vis-à-vis KST (*Master Pipe Conversion Agreement of 29 November 2001*).

In a new Memorandum of Understanding which was signed on 29 May 2003 by Denro and SPU, on the one hand, and a number of Balli companies, including KST and STS, on the other hand (*"the 2003 MoU"*), it was specified, *inter alia:*

-- that Balli had liquidated the Jindal inventory and receivables existing prior to the arrangement entered with Balli, that the amount so realized by Balli, being approximately $14 million, was intended to be set off against the Jindal repayment obligation, and that the encumbrance on the security provided was intended to be reduced by the same amount, and

-- that Jindal and Balli would reconcile all the money paid by Balli to Jindal over the period of time with the invoices of Jindal to Balli for tolling fees and that any excess funds received by Jindal would be treated as an advance tolling fee from Balli to Jindal.

### (d) Liquidation of assets

As a result of the transactions between the parties, KST was entitled to collect Denro's and SPU's receivables which resulted in an amount of approximately $5.76 million being made available to KST. Moreover, STS, on behalf of KST or more generally of the Balli Group, liquidated Denro's and SPU's inventory by making so-called pass-through sales. These transactions resulted in an inflow of capital of approximately $8.74 million. The total amount obtained through these transactions was therefore approximately $14.5 million. The question on which the parties disagree is whether this amount should be considered to have reduced the debt based on the Trade Payables. KST argues, *inter alia*, that these proceeds were re-lent to Denro and SPU in the form of new loans, the result being that the amount of the Trade Payables was not affected. In JISCO's opinion, they did reduce the amount of the Trade Payables to approximately $8.3 million.

The Arbitral Tribunal initially notes that the prime obligor in respect of the Trade Payables was JISCO and that JISCO was not a party to the transactions relating to the Foothill Loan, the Conversion Agreements or any of the Amendments to Loan Documents and Forbearance Agreements. However, it does not follow that the transactions with Denro and SPU were without effect on JISCO's indebtedness. Where a guarantor pays a debt, this benefits the prime obligor in relation to the creditor in the same way as if the prime obligor had paid the debt himself. Consequently, in so far as KST can be considered to have received payments for the Trade Payables from Denro's or SPU's assets, such payments must be considered also to have reduced JISCO's debt to the same extent.

### (i) Structure of the transactions between the parties

The Arbitral Tribunal notes that, by taking over the Foothill Loan and by entering into other arrangements with the Jindal companies, KST acquired the right to liquidate Denro's and SPU's pre-existing receivables and inventory. It was also agreed, in particular in the Conversion Agreements, that the Balli companies, through STS, should cover Denro's and SPU's production costs by paying so called tolling fees.

The question arises as to whether KST can be considered to have been entitled to use the proceeds from the liquidation of pre-existing receivables and inventory for the purpose of paying tolling fees, although such fees were aimed to support new production of plates and pipes.

The Arbitral Tribunal understands the general structure of the transactions between the parties to be, on the one hand, that KST had obtained security for existing payables (the Foothill Loan and the Trade Payables) in Denro's and SPU's property and that this property, in so far as it was liquidated by KST, should be used for payment of those debts which the property had been intended to secure. On the other hand, there were separate agreements about the further co-operation between the parties meaning, in essence, that STS should to a large extent finance Denro's and SPU's coming production by paying tolling fees with the aim that this production should in the end prove lucrative and give profits to both parties.

Evidence of Denro's, SPU's, KST's and STS's intentions in regard to the use of the liquidated pre-existing assets is also to be found in the 2003 MoU, in particular in its Section 1 which reads as follows:

"1. **REPAYMENT OBLIGATION:** Based on the assignment of the Foothill Capital Corporation loan to BALLI and the trade payables owed by JINDAL to BALLI a total repayment obligation had arisen as per the forbearance agreement referred above. This resulted in BALLI liquidating the JINDAL inventory and receivables existing prior to the arrangement entered with BALLI. The amount so realised by BALLI is approximated $14 Million (United States Dollars Fourteen Million). It is intended that this amount so realized by BALLI be set off against the JINDAL repayment obligation and the encumbrance on the security provided be reduced by the same amount."

The Arbitral Tribunal finds it significant that in this provision a reference is first made to a total repayment obligation based on the Foothill Loan and the Trade Payables and that the intention is then declared to be that the amount of approximately $14 million obtained from the liquidation of assets should be set off against the repayment obligation. This clearly suggests that the parties had intended the proceeds from the liquidation to be used for reduction of the total Jindal debt composed of the two elements: Foothill Loan and Trade Payables. It is true that, as pointed out by KST, the preamble to the 2003 MoU speaks in more general terms of various agreements "relating to the repayment obligations of the Foothill Capital Corporation Loan, the trade payables and the management of the operations of the Jindal Pipe and Plate mill located at Baytown, Texas, U.S.A.", but this wording does not contradict or modify the rather clear language of Section 1, in particular since the reference to the management of the operation of the pipe and plate mill would not seem to be connected with Section 1 but rather with Section 5 of the MoU which deals with the future operations of the plate and pipe mill.

The Arbitral Tribunal further notes that the Conversion Agreements, which were concluded on 29 November 2001, provided in Section 11 (a) that STS should pay to Denro and SPU respectively a portion of the proceeds of the sale of Converted Plates, Converted Pipes and Steel Scraps realized during the preceding month. According to the definitions in the Agreements, the terms Converted Plates and Converted Pipes referred to plates and pipes converted "pursuant to this Agreement", which makes it clear that no retroactive application to previously existing inventory was intended.

Section 11 (b) of the Conversion Agreements regulated how the proceeds from the sale should be applied and paid by STS. KST has attached some weight to the fact that this paragraph deals with the sale not only of Converted Plates, Converted Pipes and Steel Scraps but also in general terms of "steel plates" and "steel pipes" which should, in KST's opinion, give the paragraph a wider application. However, the Arbitral Tribunal finds that, when read in conjunction with Section 11 (a) as well as with sub-paragraphs (i) – (v), Section 11 (b) must be understood to mean that it should only apply to plates and pipes converted after the Conversion Agreements had become applicable and not to pre-existing inventory.

Moreover, there is considerable evidence in the case showing that in fact the sales of pre-existing inventory were not dealt with under the system established in Section 11 of the Conversion Agreements but as so called "pass-through sales", which were accounted for separately.

KST has also attached some importance to the fact that there are two First Amendments of 8 November 2002 to the Conversion Agreements and that these Amendments provide for a certain retroactive application back to 1 July 2001. However, as the Arbitral Tribunal reads these Amendments, they only provide for retroactive application of specific provisions on production costs, and they do not imply that the Conversion Agreements shall in general be

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

applied to the sale of Denro's and SPU's pre-existing inventory. The Arbitral Tribunal therefore considers them to be without significance for the issue which is relevant in this case.

It follows, in the Arbitral Tribunal's opinion, that neither KST nor STS on its behalf was entitled to use the proceeds from any collection of receivables or from any sale of inventory from the period preceding the Conversion Agreements for payment of tolling fees under the Conversion Agreements.

*(ii) The issue of new loans*

However, KST has argued that proceeds from the collection of receivables and the sale of inventory were re-lent to Denro and SPU as new loans under the revolving loan system applicable to the Foothill Loan.

The Arbitral Tribunal accepts that in accordance with Section 1.1 (a) of the Loan and Security Agreements, as taken over by KST in the Assignment and Assumption Agreement, KST had undertaken, at Denro's or SPU's request, to make revolving loans to them, subject to certain conditions and within certain limits. The question therefore arises whether the payments which were frequently made by KST or STS at Denro's and SPU's request were, wholly or partly, revolving loans under the Foothill umbrella.

However, no document has been produced which shows that Denro or SPU requested money as loans or that KST, or STS on its behalf, intended the payments made to be loans under the Loan and Security Agreements. It could indeed have been expected that KST, had it intended to give new loans, would have specified that the payments were of this nature and that KST would have referred to the specific conditions applicable to such loans. It is true that in a survey of funds collected and remitted to Denro and SPU from 17 July to 31 December 2003, there is a heading "Total Amount Funding to Denro & Saw under Foothill" and that certain transfers are called "Transfer From Foothill". Moreover, rates of interest are also indicated in this document. However, the Arbitral Tribunal finds the relevance of the document to be far from clear and cannot in any case consider it to constitute sufficient evidence that money was remitted to Denro and SPU as new loans based on the Loan and Security Agreements.

Moreover, the Arbitral Tribunal considers in general that it must be incumbent on KST to show that the amounts paid to Denro and SPU were loans and finds that KST has not satisfied this burden of proof.

*(iii) Reduction of debts*

When evaluating the legal nature of the collection of receivables and the liquidation of inventory, the Arbitral Tribunal finds the following elements to be of relevance.

Denro and SPU were indebted to KST on account of the Foothill Loan and were also guarantors in respect of the Trade Payables. The receivables and the inventory liquidated by or on behalf of KST had been pledged by both Denro and SPU as security for the Foothill Loan and, at least by SPU under the Security Agreement, also as security for the Trade Payables. Consequently, as noted above, the realized or liquidated assets should be considered to reduce those debts for which they had been pledged as security.

The Arbitral Tribunal again attaches weight to Section 1 of the 2003 MoU which refers to Jindal's total indebtedness composed of the two parts Foothill Loan and Trade Payables and indicates that the amount obtained from the liquidation should be offset against that total repayment obligation with the result that the encumbrance of the security would be reduced by the same amount.

However, since the amount of approximately $14.5 million did not suffice to cover the total indebtedness, it is necessary to determine which debt or debts should be paid first. The question is then whether, as was claimed by JISCO, there was an understanding between Jindal and Balli that the amounts realized from the liquidation of Denro's and SPU's receivables and inventory should, in the first place, be applied to the Trade Payables rather than to the debt under the Foothill Loan.

JISCO has referred in this respect to the Security Agreement between SPU and KST and argued that this Agreement also contemplates that all cash proceeds from a sale of secured assets will be used against the obligations, i.e. in this case the Trade Payables.

However, while the Security Agreement and SPU's Guaranty to which the Security Agreement refers were intended to provide security for the Trade Payables, SPU also had obligations in respect to the Foothill Loan, and it does not follow from the various agreements read together that SPU had an obligation to give priority to payment of the Trade Payables. Indeed, it appears from Section 17 of the Security Agreement – which may be read together with Section 13 (b) of the same Agreement – that the security interest granted by that Agreement, and KST's rights and powers thereunder, were considered to be subordinate in all respects to KST's rights and powers as creditor in respect of the Foothill Loan pursuant to the Loan and Security Agreement. It is also noticeable that Sections 4.3 and 8.3 of the Loan and Security Agreements give Lender a wide discretion in applying the proceeds of various transactions to the obligations which in Schedule B to the Agreements are given a very broad definition.

The Arbitral Tribunal further notes that the 2003 MoU, as stated above, reflects the parties' intention to provide for repayment of the total debt, including the Foothill Loan as well as the Trade Payables. There is no indication in this MoU that the parties had intended to give the Trade Payables precedence before the Foothill Loan. Thus, nothing in the MoU undermines the fact that Section 17 of the Security Agreement rather strongly speaks in favor of giving priority to the Foothill Loan.

Moreover, assuming that the parties had not made a choice as to the priority between the two debts, it would be the debtor or the guarantor, i.e. in this case Denro and SPU, that would choose the debt it wished to pay in the first place. KST has argued that, if KST should be considered to have received a surplus from the sales of inventory and the collection of receivables, such surplus should be deemed to be repayment of the Foothill Loan. The Arbitral Tribunal agrees that for Denro and SPU repayment of the Foothill Loan would probably have appeared as the most natural choice, this being not only the oldest debt but also the debt that would seem to have carried with it the more burdensome obligations to pay interest to KST.

The Arbitral Tribunal therefore concludes that the Foothill Loan should be given priority before the Trade Payables and that JISCO should only be allowed to deduct from the Trade Payables that part of the amount of approximately $14.5 million which remains after coverage

of the debt relating to the Foothill Loan. It is also common ground between the parties that an amount of approximately $1.84 million, constituting KST's initial funding of Denro's activities in July 2001, should be assimilated and added to the Foothill Loan.

*(iv) Calculation*

The Arbitral Tribunal therefore finds that the proceeds from the collection of receivables and the liquidation of pre-existing inventory should be considered to have been applied first to the Foothill Loan, including the amount of initial funding, and in the second place to the Trade Payables. In the calculations, it is necessary also to take into account the accrued interest on the principal amounts.

At the Arbitral Tribunal's request, the parties have presented a number of alternative calculations as guidance for the Arbitral Tribunal. One calculation presented by each party concerns the situation that is now of interest, i.e. the situation where repayment of the Foothill Loan is given priority. The figures suggested by the parties differ in details, but the differences are small and may to some extent be explained by, on the one hand, the fact that KST started from the assumption that the amount of the Trade Payables was $22,820,311, whereas JISCO departed from a slightly higher amount of $22,852,274, and, on the other hand, that KST has calculated accrued interest until 31 March 2006 and JISCO until 30 April 2006. Since KST's main claim in this case is for the lower amount of $22,820,311, the Arbitral Tribunal finds it natural to base itself on the calculation presented by KST to which JISCO has raised no real objection. The relevant figures will then be as follows:

*Foothill:*

| | |
|---|---:|
| Original principal amount (including additional funding of $1,844,644 at inception): | $7,452,963 |
| Interest until 31 March 2006: | $93,833 |
| Total (to be paid from the amount of $14,502,642): | $7,546,796 |

*Trade Payables:*

| | |
|---|---:|
| Original principal amount: | $22,820,311 |
| Interest until 31 March 2006: | $4,944,559 |
| Reduction (from the amount of $14,502,642): | $6,955,846 |
| Remaining debt per 31 March 2006: | $20,809.024 |

The Arbitral Tribunal notes that, since interest until 31 March 2006 is included in these calculations, any further interest should be counted only as from 1 April 2006 and only on the principal amount of $[20,809,024 − 4,944,559 =]15,864,465.

*(e) Rescheduling of Trade Payables*

The second question which the Arbitral Tribunal has to examine is whether this remaining debt should be considered to have been rescheduled with the effect that the debt would be due according to an amortization schedule ending on 31 December 2008.

In this respect, the Arbitral Tribunal first notes that it was part of the parties' intentions already in the 2001 MoU that the Trade Payables would be rescheduled, although no specific date was mentioned on that occasion.

CHAMBRE — COUR INTERNATIONALE D'ARBITRAGE — INTERNATIONAL COURT OF ARBITRATION — INTERNATIONAL CHAMBER OF COMMERCE

The actual engagement by KST to reschedule the Trade Payables appeared in the Fourth and the Fifth Amendments to Loan Documents and Forbearance Agreement as well as in Amendments No. 4 and 5 to Loan Documents and Forbearance Agreement. The relevant clause is essentially the same in all these agreements, although the reference to the Plate Agreement is in the agreements regarding SPU replaced by a reference to the Pipe Agreement. The clause reads as follows:

"6. **Covenant to Extend and Restructure**. The parties hereto acknowledge Lender's efforts to assist Borrower in negotiating extended payment terms on the existing trade payables of Borrower to the parties set forth on Schedule D of the Plate Agreement ("Existing Debt"). If, upon expiration of the Forbearance Period, extended payment terms for the Existing Debt have not been finalized but Lender believes in good faith that continued negotiations will within a reasonable period of time result in the finalization of extended payment terms on the Existing Debt, then Lender and Borrower shall negotiate in good faith for an extension to the Forbearance Period in order to provide adequate time to finalize extended payment terms on the Existing Debt. If the Forbearance Period (including any extensions) terminates and Lender believes in good faith that continued negotiations will not result within a reasonable period of time in extended payment terms on the Existing Debt, then, subject to the review and approval of Hermes Kreditversicherungs-AG, Lender acknowledges and agrees to reschedule the Obligations, including the $22.8 million payable referred to in Section 5, pursuant to an amortization schedule ending December 31, 2008."

Schedule D of the Plate Agreement contains a "Payables Summary" for Denro as of 20 October 2001. The summary includes a debt to KST of $22,852,274.26. The reference in the Fourth and the Fifth Amendments to this Schedule D as well as the end of the paragraph, which refers specifically to the $22.8 million payables, thus makes it clear that the Trade Payables were included in the debt which, under certain circumstances, was to be rescheduled on an amortization basis during a period ending on 31 December 2008.

It thus appears that KST made an undertaking, although a conditional one, to reschedule the Trade Payables. However, this undertaking was made in agreements with Denro and SPU and not with JISCO which was the prime obligor in respect of the Trade Payables. The Arbitral Tribunal observes that an undertaking to reduce or change the obligation of a guarantor does not automatically affect the obligations of the prime obligor, and there is no indication in the wording of the Fourth or the Fifth Amendment showing that KST intended also to alleviate the burden for JISCO. The Arbitral Tribunal therefore finds it at least highly doubtful whether JISCO was in principle entitled to benefit from the undertaking KST made in relation to Denro and SPU.

However, even if KST's undertaking in the Fourth and Fifth Amendments were to be interpreted as having been made also for the benefit of JISCO, the Arbitral Tribunal cannot find it established that KST failed to honor its undertaking for the following reasons.

The Arbitral Tribunal notes that the undertaking in the Fourth and Fifth Amendments – which applies when KST believes in good faith that continued negotiations will not result within a reasonable period of time in extended payment terms on the existing debt – means that KST acknowledges and agrees, but only subject to the review and approval of Hermes, to reschedule the obligations, including the Trade Payables, pursuant to an amortization schedule ending on 31 December 2008.

There is no doubt that Hermes's approval was not obtained, and the only question that arises is whether KST acted in good faith in order to obtain such approval.

The Arbitral Tribunal notes that Hermes, in a letter of 15 January 2002, referred to a previous telephone conversation and indicated its consent to a rescheduling of the debt but only on condition that all creditors agreed to reschedule their claims. It further appears that KST had contacts with other creditors, the result of which was that it was not possible to obtain a general agreement among them. The condition laid down by Hermes was therefore not satisfied.

JISCO has argued that the reason why the consent of all the creditors could not be obtained was that KST withdrew its original idea of offering them a *pari passu* treatment with KST in respect of the security for their credits. The Arbitral Tribunal notes, however, that KST had not made any undertaking in the Fourth and Fifth Amendments to offer the other creditors such treatment. Nor has it been established that it made such an undertaking in any other manner.

JISCO has also alleged that KST, after the failure to obtain agreement among the creditors, did not make a serious attempt to obtain Hermes's consent to a rescheduling by KST alone. As regards the possibilities that may or may not have existed for such a solution, the parties' views diverge and each party has relied, in support of its position, on evidence by an insurance expert. The Arbitral Tribunal cannot find this evidence to be conclusive in either direction and must therefore lay particular weight on the fact that Hermes had stated in unambiguous terms that a condition for its approval was that all creditors had to agree. In the Arbitral Tribunal's opinion, it is in no way established that KST, even if it had pursued discussions with Hermes, would have succeeded in making Hermes change its mind and agree to a one-sided rescheduling by KST alone.

### (f) Party substitution

After the proceedings in this case had been closed, KST announced that it had received information that JISCO had either changed its name or been merged into JSW Steel, formerly known as JVSL. KST asked for clarifications of this matter.

In subsequent messages, Respondent replied that JISCO had in fact merged into JVSL, which had changed its name to JSW Steel, that the merger was accomplished on 4 February 2005, and that JISCO had ceased to exist as a legal entity. Respondent added that JVSL had assumed responsibility for JISCO's liabilities.

Having regard to this information, KST requested that JSW Steel be substituted for JISCO as the Respondent in the award, to which Respondent replied as follows:

"Respondent will stipulate as follows:

'Respondent stipulates that JSW Steel, Ltd., formerly known as Jindal Vijaynagar Steel Ltd. and into which Jindal Iron & Steel Co. Ltd. (JISCO) was merged, may be substituted for JISCO as the respondent in any award the Tribunal may issue. This stipulation is subject to and without waiver of any objections JISCO has to the jurisdiction of the Tribunal, which objections may be asserted by JSW Steel, Ltd.' "

The Arbitral Tribunal, having regard to KST's request and Respondent's reply, finds that the obligations which the Arbitral Tribunal has found to be incumbent on JISCO in this Final Award have been taken over by JSW Steel and that the payment orders in the operative part of the Award should therefore not be addressed to JISCO but to JSW Steel as the successor of JISCO.

*(g) Conclusions*

It follows from the above

– that the Arbitral Tribunal has jurisdiction to rule on the claims in this arbitration,

– that KST's main claim shall be granted in an amount of $20,809,024 plus interest as from 1 April 2006 on the principal amount of $15,864,465,

– that JSW Steel, as JISCO's successor, shall be liable to pay these amounts, and

– that the orders requested by JISCO shall not be issued.

The Arbitral Tribunal notes that JISCO has expressed some concern that an obligation for JISCO to make a payment in respect of the Trade Payables might lead to a double recovery in view of the fact that a corresponding claim against Denro and SPU as guarantors of the same debt is being litigated before a Texas court. The Arbitral Tribunal cannot make any ruling which would be binding in the Texas litigation but finds it obvious that a payment by the main obligor will have a direct effect on the obligations of the guarantors and that the end-result must be that the amount of the debt shall only be paid once.

*(h) Main cost claims*

The parties have presented cost claims in the following amounts:

*KST:* $1,960,121, including the following legal fees:
| | |
|---|---|
| – Vinge: | $471,000 |
| – Jackson Walker: | $247,300 + $692,000 |
| – Bridgehouse Rueckel & Bolthausen: | $117,300 |
| Total: | $1,527,600 |

*JISCO:* $1,417,742.42, including the following legal fees:
| | |
|---|---|
| – Vinson & Elkins: | $735,972.10 |
| – Greenberg Traurig: | $149,200 |
| – Mannheimer Swartling: | $357,759 |
| Total: | $1,242,931.10 |

The expenses for which the parties claim compensation are the following:

*KST:*
| | |
|---|---|
| – Vinge, disbursements: | $22,698 |
| – Jackson Walker, disbursements: | $34,282 |
| – Bridgehouse Rueckel & Bolthausen, disbursements: | $3,824 |
| – costs witnesses: | $27,667 |
| – Grant Thornton, expert report etc.: | $317,395 |
| – legal opinion: | $21,800 |
| – costs of premises: | $4,855 |
| Total: | $432,521 |



*JISCO:*
- Vinson & Elkins, disbursements:     $73,594.16
- Greenberg Traurig, disbursements:    $20,409.61
- Mannheimer Swartling,
   disbursements:                     $12,772
- FTI Consultants, expert witness
   opinion etc.:                        $55,276
- court reporting and transcription     $7,491.55
- costs of premises etc.            $5,267
Total:                         $174,810.32

As regards the distribution of costs between the parties, the Arbitral Tribunal notes KST's arguments that approximately one third of its claimed amount is related to the jurisdictional phase of the proceedings and that the fees related to the merits phase were in part incurred due to defenses subsequently withdrawn by JISCO.

The Arbitral Tribunal notes that the jurisdictional issues were an important part of the proceedings in regard to which there was a separate and relatively lengthy hearing and which resulted in a separate reasoned Decision by the Arbitral Tribunal, dated 8 July 2005. The Arbitral Tribunal finds no reason to question KST's affirmation that approximately one third of its costs were related to that part of the proceedings. Since KST was the winning party in respect of jurisdiction, the Arbitral Tribunal considers that JISCO, now succeeded by JSW Steel, shall both bear its own costs and compensate KST for costs in so far as they relate to that issue.

As to the substantive issues dealt with in this Award, the Arbitral Tribunal notes that KST is partly successful but is granted no more than approximately two thirds of its principal claim. Having regard to this outcome of the case, the Arbitral Tribunal considers that JISCO, now succeeded by JSW Steel, shall bear its own costs for this second phase of the proceedings and compensate KST for one third of its reasonable costs relating to the substance of the case. By paying its own costs and one third of KST's costs, JISCO, succeeded by JSW Steel, will have paid approximately two thirds of the total costs for the substantive part of this arbitration, which corresponds to the outcome of the case at this second stage.

However, there is one further element which should be given some weight in this connection, and that is the fact that, as pointed out by KST, JISCO withdrew certain defenses at a late stage of the proceedings. It must indeed be assumed that some work carried out by KST related to defenses which were not in the end part of JISCO's case. While there is no basis in the available materials for quantifying this work, the Arbitral Tribunal considers that it justifies a moderate increase of the compensation to be paid by JISCO, succeeded by JSW Steel.

As JISCO/JSW Steel's responsibility for costs should be limited to reasonable costs, the Arbitral Tribunal must examine whether the costs claimed by KST are reasonable. In this regard, the Arbitral Tribunal notes the objections raised by JISCO and, in particular, JISCO's request that the Arbitral Tribunal should disallow $692,000 in costs for Jackson Walker and that the Grant Thornton costs be limited to an amount of $55,276, i.e. an amount corresponding to what JISCO paid for corresponding work carried out by FTI Consultants. In essence, JISCO argued in this regard that KST should not be allowed to transfer litigation costs to the arbitration proceedings and be compensated for them in this award. The Arbitral

Tribunal further notes that JISCO has not contested the reasonableness of the other costs for which KST claims compensation.

The Arbitral Tribunal notes that the close link between the arbitration proceedings and the litigation in the Texas court makes it difficult in some respects to distinguish costs relating to that litigation from costs incurred in the present arbitration. Moreover, it is clear that some costs relate to work of value in both proceedings and that in respect of such costs partial compensation may legitimately be claimed in the arbitration proceedings.

However, the Arbitral Tribunal considers that a cautious approach should be taken to claims relating to work of importance in both proceedings. Special caution would seem to be justified as regards the very large claim of $692,000 for legal fees to Jackson Walker which comes on top of another claim of $247,300 for legal fees to Jackson Walker relating exclusively to the arbitration. The Arbitral Tribunal has considered the explanations provided by Mr. Williamson in his letter of 20 April 2006 to Mr. Broomé but is not satisfied that the claim of $692,000 for fees can be considered in its entirety to relate to work which was reasonably required for the conduct of KST's case in the arbitration proceedings. Making a cautious evaluation, the Arbitral Tribunal considers that, for the purpose of reimbursement from JISCO, this amount should be reduced to $400,000.

As regards Grant Thornton's work, the Arbitral Tribunal is of the opinion that the analyses and calculations contained in Mr. George Y. Banks's reports were very useful for the examination of the case, as was indeed also the corresponding information in Mr. Richard W. Hoban's report relied on by JISCO. The fact that KST's compensation claim of $317,395 is considerably higher that JISCO's claim of $55,276 may to some extent be explained by the fact that the initial study of the accounting material was probably made by Mr. Banks and that Mr. Hoban could therefore at least partly base his analysis on already identified figures. Nevertheless, the Arbitral Tribunal notes that KST's claim is in this regard very high, both in itself and compared with JISCO's corresponding claim, and takes into account that a report prepared by Grant Thornton has apparently also been relied on in the Texas litigation. The Arbitral Tribunal, which in such circumstances considers a cautious approach to the large claim to be justified, finds it reasonable, for the purpose of reimbursement from JISCO/JSW Steel, to assess the cost reasonably incurred by KST in this arbitration for Grant Thornton's work as being $100,000.

Consequently, the Arbitral Tribunal, pursuant to Article 31 of the ICC Rules of Arbitration and and in the exercise of its broad discretion in the allocation of costs, finds

– that KST's reasonable costs (fees and expenses), for the purpose of reimbursement, were as follows:

| | |
|---|---|
| Vinge | $471,000 + 22,698 |
| Jackson Walker | $247,300 + 400,000 + 34,282 |
| Bridgehouse Rueckel & Bolthausen | $117,300 + 3,824 |
| Costs witnesses | $27,667 |
| Grant Thornton | $100,000 |
| Legal opinion | $21,800 |
| Cost of premises | $4,855 |
| Total | $1,450,726 |



– that one third of this amount, i.e. $483,575, relates to the jurisdictional phase and should be compensated in its entirety by JSW Steel, and

– that, as regards the remainder, i.e. $967,151, JSW Steel should compensate KST for one third, i.e. $322,383.

The amount resulting from these calculations is thus $[483,575 + 322,383 =]805,958. However, in order also to give KST some compensation for work relating to the defenses withdrawn by JISCO, the Arbitral Tribunal considers that this amount should be increased to $850,000.

The ICC International Court of Arbitration has determined the costs of the arbitration, comprising the arbitrators' fees and expenses and ICC administrative expenses, at $480,000. Each party having paid $240,000 to the ICC as advance on costs, both parties have met their payment obligations in this respect.

As regards these arbitration costs, the Arbitral Tribunal does not find it appropriate to make any distinction between costs relating to the jurisdictional phase and the merits phase of the proceedings but considers, pursuant to Article 31(3) of the ICC Rules of Arbitration, that JISCO should ultimately bear two thirds and KST one third of the costs for the work of the arbitrators and the ICC International Court of Arbitration.

### (i) Additional cost claim

KST has submitted a "Supplemental Bill of costs" in which it asked to be compensated for legal fees for services rendered in the period 1 June – 11 July 2006 on the matter of Respondent substitution. The amounts claimed are SEK 170,000 relating to services of the Vinge Law Offices and USD 2,000 relating to services of Advani & Co, Mumbai, India. KST specified that these claims include "communications with the Client, Indian Counsel, Tribunal and Respondent Counsel, review of documentation, research, preparation and drafting of documents, including letters to the Tribunal of 26 June and 11 July 2006".

Respondent has objected to the submission or awarding of any additional costs for the following reasons. First, the Arbitral Tribunal had declared the proceedings, and not only the merits submissions, closed. Second, the claimed fees are unwarranted, because, immediately after KST had raised the issue of party substitution, Respondent had offered to stipulate formally that JSW Steel was responsible for any award that might be issued against JISCO and that, when KST's counsel was still not satisfied, Respondent offered that JSW Steel could be substituted for JISCO in any award. Third, if the Arbitral Tribunal should reopen the proceedings to receive further evidence of costs, Respondent asserted its right to review the documentation of such costs. Fourth, if the Arbitral Tribunal should simply substitute JSW Steel for JISCO in any award, as Respondent has stipulated, then Respondent would be the prevailing party on this issue and no further fees to KST would be justified.

Respondent added that Claimant knew about the planned JISCO-JVSL merger since long before the request for arbitration and even intervened and became a party to the Indian court proceedings about the proposed merger. Respondent's counsel further pointed out that he had been retained by Denro to represent JISCO and had had little contact with JISCO itself.

The Arbitral Tribunal notes that the issue of party substitution first arose in these proceedings on 2 June 2006, when KST asked the Arbitral Tribunal to request information in this regard from Respondent. This was after the proceedings had been declared closed pursuant to Article 22 of the ICC Rules of Arbitration which provides that after such closure no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

However, since the new issue which had arisen could be of considerable importance for the enforcement of the Final Award, the Arbitral Tribunal found it necessary to clarify whether JISCO, which was the Respondent in the case, still existed as a legal entity and, if not, to analyse the legal consequences following from such a changed situation. The Arbitral Tribunal therefore allowed a further exchange of information and arguments on this specific matter and even encouraged the parties to find a solution which would ensure the effectiveness of the Final Award that would be issued.

Having thus permitted a continuation of the proceedings in regard to this specific issue, the Arbitral Tribunal would find it inconsistent to reject on formal grounds a claim for costs relating to work on that very issue. The Arbitral Tribunal must therefore examine whether KST is entitled to compensation for additional fees.

In the Arbitral Tribunal's opinion, it is remarkable that the facts regarding the merger were not brought to the Arbitral Tribunal's attention at an earlier stage of the proceedings. If this had been done, it would presumably have made it possible to regulate the matter in a practical manner at the final hearing at the latest.

It could indeed have been expected that JISCO, or JVSL or JSW Steel as its successor, should have instructed its counsel to give the Arbitral Tribunal full information about the merger, especially in view of JVSL's undertaking in the Merger Plan to have all proceedings initiated by or against JISCO transferred into its name.

On the other hand, it also appears that KST actively participated in the proceedings regarding the merger and must therefore at least have been aware that a merger of JISCO was being planned and envisaged. It could therefore have been expected that KST would closely follow the development of the merger proceedings and would consider the consequences of the merger for the present arbitration proceedings.

Consequently, the Arbitral Tribunal considers that both parties may to some extent be considered responsible for the fact that the issue of party substitution was not raised before the Arbitral Tribunal at an appropriate time during the arbitration proceedings. The Arbitral Tribunal further notes that, after the matter was raised, belatedly, by KST, Respondent, which was at that time in reality JSW Steel, demonstrated its willingness to find a practical solution which would not jeopardize the enforcement of the Final Award.

Making an overall assessment of these various elements, the Arbitral Tribunal does not find it appropriate to make an additional order for costs relating to the issue of party substitution.



## AWARD

1. The Arbitral Tribunal confirms its rulings on jurisdictional issues in its Decision of 8 July 2005.

2. JSW Steel Ltd., as successor of Jindal Iron & Steel Co. Ltd., shall pay to Balli Klöckner GmbH twenty million eight hundred and nine thousand twenty-four United States dollars (US$20,809,024) and interest on an amount of fifteen million eight hundred and sixty-four thousand four hundred and sixty-five United States dollars (US$15,864,465), at an interest rate *per annum* being three per cent (3%) over the official rate of the Deutsche Bundesbank, as from 1 April 2006 until full payment is made.

3. JSW Steel Ltd., as successor of Jindal Iron & Steel Co. Ltd., shall pay to Balli Klöckner GmbH as reimbursement of costs for legal representation and expenses eight hundred and fifty thousand United States dollars (US$850,000) and interest on that amount at a rate corresponding to the Swedish official reference rate plus eight percentage units per year, as from the date of this Award until full payment is made.

4. All other claims in this arbitration are dismissed.

5. According to the decision of the ICC International Court of Arbitration, the total amount of the costs of arbitration is four hundred and eighty thousand United States dollars (US$480,000) consisting of the following items:
– administrative expenses: US$51,774
– fees of the Chairman: US$156,370
– fees of the co-arbitrators: US$234,556
– expenses of the Arbitral Tribunal: US$37,300

6. JSW Steel Ltd., as successor of Jindal Iron & Steel Co. Ltd., shall bear two thirds and Balli Klöckner GmbH one third of the costs of arbitration specified in the preceding paragraph. Accordingly, JSW Steel Ltd. shall reimburse Balli Klöckner GmbH, in respect of its advance payment for costs, an amount of eighty thousand dollars (US$80,000).

Place of Arbitration: Stockholm, Sweden
Date: September 4, 2006

Hans Danelius          Robert L. Simpson, Jr.          Abraham D. Sofaer

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 10 October 2006

Anne Marie WHITESELL
Secretary General
ICC International Court of Arbitration