

**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** ● **Cour internationale d'arbitrage**

# AWARD

CERTIFIED TRUE COPY OF THE ORIGINAL

PARIS, 10 October 2006

*Anne Marie Whitesell*

Anne Marie WHITESELL
Secretary General
ICC International Court of Arbitration

***ICC International Court of Arbitration***
***Case No. 13251***

# FINAL AWARD

rendered in Stockholm on September 4, 2006

**Claimant:**
Balli Klöckner GmbH, Schifferstrasse 200, DE-47059 DUISBURG, Germany, represented by
*Counsel:*
1. Mr. Mikael Broomé and Mr. Ola Sandersson, Advokatfirman Vinge, Box 1703, SE-111 87 STOCKHOLM, Sweden
2. Mr. B. Edward Williamson, Jackson Walker LLP, 1401 McKinney Street, Suite 1900, HOUSTON, Texas 77010, USA

**Respondent:**
JSW Steel Ltd., as successor of Jindal Iron & Steel Co. Ltd, Jindal Mansion, 5A, Dr. G. Deshmukh Marg, MUMBAI-400 026, India, represented by
*Counsel:*
1. Mr. Allan Van Fleet, Greenberg Traurig LLP, 1000 Louisiana Street, Suite 1800, HOUSTON, Texas 77002, USA
2. Mr. James L. Loftis, Vinson & Elkins, 2300 First City Tower, 1001 Fannin Street, Suite 2300, HOUSTON, Texas 77002-6760, USA
3. Mr. Kaj Hobér and Mr. Fredrik Norburg, Mannheimer Swartling Advokatbyrå, Box 1711, SE-111 87 STOCKHOLM, Sweden

**The Arbitral Tribunal:**
Mr. Hans Danelius, Mr. Robert L. Simpson, Jr. and Professor Abraham D. Sofaer

**Place of Arbitration:**
Stockholm, Sweden

## 1. General background

Balli Klöckner GmbH is a German company, whose previous name was Klöckner Steel Trade GmbH and which will hereinafter be referred to as *"KST"*. It is a steel trading company and belongs to the Balli Group.

Jindal Iron & Steel Co. Ltd., hereinafter referred to as *"JISCO"*, was a company based in India which was doing business in the field of production of flat rolled steel products. According to an arrangement which became effective in February 2005, JISCO was merged into Jindal Vijayanagar Steel Ltd. (*"JVSL"*), which, in June 2005, changed its name to JSW Steel Ltd. (*"JSW Steel"*).

The main facts of the case are as follows:

During 2000, KST issued the following order confirmations which were all addressed to JISCO:

Confirmation of Order No. 290120, dated 21 February 2000
Confirmation of Order No. 290140, dated 31 March 2000

Confirmation of Order No. 290152, dated 8 May 2000
Confirmation of Order No. 290162, dated 2 June 2000
Confirmation of Order No. 290180, dated 24 July 2000

In all these order confirmations, KST confirmed having sold to JISCO for direct export to and consumption in the USA "PRIME AND NEWLY PRODUCED CONTINUOUS CAST STEEL SLABS IN QUALITY A 36".

The order confirmations contained the following provisions in regard to payment and interest:

"PAYMENT TO BE EFFECTED MAX. 150 DAYS AFTER DATE OF BILL OF LADING AGAINST DOCUMENTS SPECIFIED IN THIS CONTRACT AND RECEIVERS WRITTEN CONFIRMATION OF RECEIPT.
- - -
IN THE EVENT OF LATE PAYMENT, WE RESERVE THE RIGHT TO DEBIT YOUR ACCOUNT WITH THE CURRENT RATE OF INTEREST BEING 3 PERCENT OVER THE OFFICIAL RATE OF DISCOUNT OF THE DEUTSCHE BUNDESBANK AND THE COSTS FOR EXTANDING (sic) OUR FORWARDCOVER FOR THE RATE OF EXCHANGE."

The order confirmations also contained various conditions in regard to delivery, marking, tolerances, technical features and chemical composition. There were clauses about inspection, non-compliance with the specification, warranty, guarantee and force majeure. Producer of the goods would be Ilyich Iron and Steel Works in Mariupol, Ukraine, and the receiver would be US Denro Steels, Inc., P.O. Box 2549, 5200 East Mc Kinney Road, Baytown, Texas, USA.

All the five order confirmations contained the following arbitration clause:

"5. ARBITRATION
THE PARTIES WILL ENDEAVOR TO THE FULLEST EXTENT TO SETTLE ANY CONTROVERSY ARISING OUT OF THE PRESENT CONTRACT IN ANY MANNER. IN CASE IT IS NOT POSSIBLE TO FIND AN AMICABLE SETTLEMENT, THEN THE CONTROVERSY WILL BE RESOLVED THROUGH ARBITRATION TO BE CONDUCTED IN ACCORDANCE WITH THE CONCILIATION AND ARBITRATION RULES OF THE INTERNATIONAL CHAMBER OF COMMERCE. THE DECISION OF THE ARBITRATORS SHALL BE FINAL AND BINDING ON THE PARTIES. ARBITRATION BE HELD IN STOCKHOLM IN ACCORDANCE WITH SWEDISH LAW."

Attached to the order confirmations were conditions of sale which, in regard to applicable law, provided as follows in point XI.3:

"The law governing inhabitants of the Federal Republic of Germany shall apply to all legal relationships between the purchaser and ourselves."

The order confirmations were signed on behalf of KST and were also furnished with JISCO's stamp and a signature on behalf of JISCO.

KST issued the following invoices, which were addressed to JISCO:

Invoice of 8 April 2000, relating to Order No. 290120, amount USD 5,171,484.74
Invoice of 27 April 2000, relating to Order No. 290120, amount USD 2,066,109.46
Invoice of 2 June 2000, relating to Order No. 290140, amount USD 3,791,710.84
Invoice of 10 July 2000, relating to Order No. 290152, amount USD 3,917,911.91
Invoice of 16 August 2000, relating to Order No. 290162, amount USD 1,348,998.49
Invoice of 1 September 2000, relating to Order No. 290162, amount USD 3,047,886.90
Invoice of 7 October 2000, relating to Order No. 290180, amount USD 4,116,713.69

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

3

The invoices contained the same conditions as the order confirmations in regard to time of payment and interest in case of delayed payment.

The sum of the invoiced amounts is $23,460,310.53. Payments were made on 21 December 2000 of $600,000 and on 31 August 2000 of $40,000, the remainder being $22,820,310.53 (*"the Trade Payables"*).

International promissory notes, dated 8 April, 27 April, 13 June, 24 July, 23 August, 11 September and 16 October 2000 respectively, in which JISCO promised to pay the amounts in the seven invoices, were issued and signed on behalf of JISCO.

On 8 June 2001, a Memorandum of Understanding (*"the 2001 MoU"*) was signed by Vahid Alaghband on behalf of KST and other companies belonging to the Balli group (*"the Balli Parties"*) and by P.R. Jindal on behalf of JISCO, US Denro Steels, Inc. (*"Denro"*, also named Jindal United Steel Company, *"JUSCO"*), SAW Pipes USA, Inc. (*"SPU"*), and other companies of the "Jindal family" (*"the Jindal Parties"*). According to the introductory part, the 2001 MoU was meant to set forth the parties' "current mutual intention with respect to certain transactions to be entered into" by the parties and their affiliates. The 2001 MoU further read as follows:

"WHEREAS, the Jindal Parties has (*sic*) received materials from KST and are indebted to KST for certain amounts in connection therewith, and are indebted to certain third parties as well; and

WHEREAS, the Jindal Parties have requested the Balli Parties to reschedule the existing indebtedness of the Jindal Parties to the Balli Parties; and

WHEREAS, the parties wish to work out a basis for the Balli Parties to assist the Jindal Parties in making satisfactory arrangement for the payment of its indebtedness; and

WHEREAS, the Jindal Parties have requested the Balli Parties to acquire the rights of Foothill Partners under the Jindal Parties' existing obligations to Foothill Partners; and

WHEREAS, the Jindal parties require new raw materials for the operations of their mills, and have requested the assistance of the Balli Parties in obtaining such raw materials;

1. The Balli Parties and the Jindal Parties intend to negotiate in good faith between themselves, and with third parties as necessary, in an effort to enter into mutually satisfactory definitive agreements (the "Agreements") effecting and implementing the following transactions:

(a) The Balli Parties would purchase from Foothill its existing $850,000 note from [SPU] and $6.5 million note from Denro or, alternatively, the Balli Parties would purchase (or arrange for the purchase of) inventory from [SPU] and Denro in amounts sufficient to fund the payment by them in full of the Foothill notes.

(b) [JISCO's] existing payables of approximately $22.8 million plus interest to KST and $7.1 million to Thyssen (both of which are insured by Hermes Kreditversicherungs-AG ("Hermes")) would be rescheduled with [JISCO], guaranteed by Denro and [SPU], and, subject to the obligations of the Jindal Parties to any existing agreements with USX Corporation entered into in connection with the acquisition of the steel plate mill operated by Denro (the "USX Agreements"), secured by the assets (including receivables and inventory) and equity of Denro and [SPU].

(c) The Balli Parties and the Jindal Parties would form a joint venture ("JV") with a term of 10 years, pursuant to which - - -

(i)

- - -

(v) the revenues generated by the operations of Denro and [SPU's] mills would be applied as follows:

First, to cover the costs of operation and production;

Second, to pay for raw materials used in production;

Third, to be split 25% to the Balli Parties and 75% to the Jindal Parties (the "Jindal Proceeds");

(vi) The Jindal Proceeds would be used to repay the restructured indebtedness;

- - -

(d) The Balli Parties would assist Denro in negotiating extended payment terms on existing trade payables of Denro to Euroasia, Leman, Mitsubishi, and other creditors. - - -

- - -

2. The Jindal Parties and the Balli Parties acknowledge and agree that each of the material steps of the transactions contemplated hereby in respect of the Hermes covered receivables provided in paragraph 1(b) above and the agreements with respect thereto will be subject to the review and approval of Hermes.

- - -

7. The provisions of paragraphs 3, 4, 5 and 6 of this Memorandum of Understanding are intended to constitute binding agreements of the parties with respect to the provisions set forth therein. The balance of this Memorandum of Understanding is intended to indicate the current intent of the parties and is not intended to constitute a binding obligation of the parties. Without limitation of the foregoing, the Jindal Parties expressly acknowledge and agree that the Balli Parties has [sic] not made any commitment to provide funding to any of the Jindal Parties, modify the terms of any existing obligations of any of the Jindal Parties to the Balli Parties, or waive or forbear the exercise of any rights that the Balli Parties may currently have or hereafter acquire. Any such commitment will be evidenced only by the execution of the Agreements setting forth such commitment and the terms and conditions thereof."

On 29 June and 13 October 1998 respectively, Denro and SPU had taken up revolving loans according to Loan and Security Agreements with NationsCredit Commercial Corporation and had issued mutual guaranties for their respective obligations as debtors under these Agreements. SPU had issued a guaranty in respect of Denro's loan, and Denro had issued a limited recourse guaranty in respect of SPU's loan.

The loans under the two Loan and Security Agreements were subsequently taken over by Foothill Capital Corporation ("Foothill"), and they will hereinafter be jointly called "the Foothill Loan". On 5 July 2001, an Assignment and Assumption Agreement was concluded by Foothill and KST with the consent of Denro and SPU. Under this Agreement, KST was to take over all rights as creditor in respect of the Foothill Loan against payment to Foothill of $5,606,972.80 plus a certain interest in case payment was not effected on the same day.

The Loan and Security Agreements from 1998, to which KST became a party through the Assignment and Assumption Agreement, contained, *inter alia*, the following clauses:

"1. LOANS AND CREDIT ACCOMMODATIONS.

1.1 Amount. Subject to the terms and conditions contained in this Agreement, Lender will from

(a) Revolving Loans and Credit Accommodations. From time to time during the Term at Borrower's request, Lender shall make revolving loans to Borrower ("Revolving Loans"), and make letters of credit, standby letters

of credit, bankers acceptances and other credit accommodations (*"Credit Accommodations"*) available to Borrower, subject to - - -

- - -

**1.4 Repayment.** Accrued interest on all monetary Obligations shall be payable on the first day of each month. Principal of the Term Loan shall be repaid as set forth in Section 2(b) of Schedule A. If at any time any of the Loan Limits are exceeded, Borrower will immediately pay to Lender such amounts (or provide cash collateral to Lender with respect to the Credit Accommodation Balance in the manner set forth in Section 7.3), as shall cause Borrower to be in full compliance with all of the Loan Limits. Notwithstanding the foregoing, Lender may, in its sole discretion, make or permit Revolving Loans, the Term Loan, any Credit Accommodations or any other monetary Obligations to be in excess of any of the Loan Limits; *provided*, that Borrower shall, upon Lender's demand, pay to Lender such amounts as shall cause Borrower to be in full compliance with all of the Loan Limits. All unpaid monetary Obligations shall be payable in full on the Maturity Date (as defined in Section 7.1) or, if earlier, the date of any early termination pursuant to Section 7.2.

- - -

## 2. INTEREST AND FEES.

**2.1 Interest.** All Loans and other monetary Obligations shall bear interest at the Interest Rate(s) set forth in Section 3 of Schedule A, except where expressly set forth to the contrary in this Agreement or another Loan Document; *provided*, that after the occurrence of an Event of Default, all Loans and other monetary Obligations shall, at Lender's opinion, bear interest at a rate per annum equal to two percent (2%) in excess of the rate otherwise applicable thereto (the *"Default Rate"*) until paid in full - - -

- - -

## 3. SECURITY INTEREST.

**3.1** To secure the full payment and performance of all of the Obligations, Borrower hereby grants to Lender a continuing security interest in all of Borrower's property and interests in property, whether tangible or intangible, now owned or in existence or hereafter acquired or arising, wherever located, including Borrower's interest in all of the following, whether or not eligible for lending purposes: (i) all Accounts, Chattel Paper, Inventory, Instruments, Documents, Goods (including Inventory), Investment Property, General Intangibles (including trademarks, tradenames, patents, copyrights, goodwill and customer lists), Deposit Accounts and money, (ii) all proceeds and products of all of the foregoing (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties for loss or any destruction of any of the foregoing) and (iii) all books and records relating to any of the foregoing.

## 4. ADMINISTRATION.

**4.1 Lock Boxes and Blocked Accounts.** Borrower will, at its expense, establish (and revise from time to time as Lender may require) collection procedures acceptable to Lender, in Lender's sole discretion, for the collection of checks, wire transfers and other proceeds of Account (*"Account Proceeds"*), which may include (i) directing all Account Debtors to send all such proceeds directly to a post office box designated by Lender either in the name of Borrower (but as to which Lender has exclusive access) or, at Lender's option, in the name of Lender (a *"Lock Box"*) or (ii) depositing all Account Proceeds received by Borrower into one or more bank accounts maintained in Lender's name (each, a *"Blocked Account"*), under an arrangement acceptable to Lender with a depository bank acceptable to Lender, pursuant to which all funds deposited into each Blocked Account are to be transferred to Lender in such manner, and with such frequency, as Lender shall specify or (iii) a combination of the foregoing. Borrower agrees to execute, and to cause its depository banks to execute, such Lock Box and Blocked Account agreements and other documentation as Lender shall require from time to time in connection with the foregoing.

**4.2 Remittance of Proceeds.** Except as provided in Section 4.1, all proceeds arising from the sale or other disposition of any Collateral shall be delivered, in kind, by Borrower to Lender in the original form in which received by Borrower not later than the following Business Day after receipt by Borrower. Until so delivered to Lender, Borrower shall hold such proceeds separate and apart from Borrower's other funds and property in an

express trust for Lender. Nothing in this Section 4.2 shall limit the restrictions on disposition of Collateral set forth elsewhere in this Agreement.

**4.3 Application of Payments.** Lender may, in its sole discretion, apply, reverse and re-apply all cash and non-cash proceeds of Collateral or other payments received with respect to the Obligations, in such order and manner as Lender shall determine, whether or not the Obligations are due, and whether before or after the occurrence of a Default or an Event of Default. For purposes of determining Availability, such amounts will be credited to the Loan Account and the Collateral balances to which they relate upon Lender's receipt of advice from Lender's Bank (set forth in Section 11 of Schedule A) that such items have been credited to Lender's account at Lender's Bank (or upon Lender's deposit thereof at Lender's Bank in the case of payments received by Lender in kind), in each case subject to final payment and collection. However, for purposes of computing interest on the Obligations, such items shall be deemed applied by Lender one (1) Business Day after Lender's receipt of advice of deposit thereof at Lender's Bank.

- - -

## 8. EVENTS OF DEFAULT AND REMEDIES.

**8.1 Events of Default.** The occurrence of any of the following events shall constitute an *'Event of Default'* under this Agreement, and Borrower shall give Lender immediate written notice thereof: (i) - - - ; (ii) if Borrower fails to pay when due any principal or interest on any Loan or any other monetary Obligation; - - -

**8.2 Remedies.** Upon the occurrence of any Default, and at any time thereafter, Lender, at its option, may cease making Loans or otherwise extending credit to Borrower under this Agreement or any other Loan Document. Upon the occurrence of any Event of Default, and at any time thereafter, Lender, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrower), may do any one or more of the following: (i) - - - ; (iii) take possession of any or all of the Collateral wherever it may be found - - - ; (vi) sell, lease or otherwise dispose of any of the Collateral - - -.

**8.3 Application of Proceeds.** Subject to any application required by law, all proceeds realized as the result of any Sale shall be applied by Lender to the Obligations in such order as Lender shall determine in its sole discretion. Any surplus shall be paid to Borrower or other persons legally entitled thereto; but Borrower shall remain liable to Lender for any deficiency. If Lender, in its sole discretion, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any Sale, Lender shall have the option, exercisable at any time, in its sole discretion, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Lender of the cash therefor."

Section 3 of Schedule A, to which reference is made in Section 2.1 of both Agreements, contains for revolving loans an interest rate of ".5% per annum in excess of the Prime Rate".

In Schedule B to both Agreements, which contained various definitions, the term "Obligations" is defined as follows:

"*'Obligations'* means all present and future Loans, advances, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement or any other Loan Document, whether arising from an extension of credit, opening of a Credit Accommodation, guaranty, indemnification or otherwise (including all fees, costs and other amounts which may be owing to issuers of Credit Accommodations and all taxes, duties, freight, insurance, costs and other expenses, costs or amounts payable in connection with Credit Accommodations or the underlying goods), whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the commencement of a proceeding under the Bankruptcy Code or any similar statute, including all interest, charges, expenses, fees, attorney's fees, expert witness fees, audit fees, letter of credit fees, loan fees, Early Termination Fees, Minimum Borrowing Fees and any other sums chargeable to Borrower under this Agreement or under any other Loan Document."

Two further agreements were signed on 5 July 2001, i.e. the Third Amendment to Loan Documents and Forbearance Agreement (*"the Third Amendment"*) and Amendment No. 3 to Loan Documents and Third Forbearance Agreement (*"Amendment No. 3"*).

The Third Amendment was an agreement between KST as Lender and Denro as Borrower and with SPU as Guarantor. KST acted as assignee of Foothill and Banc of America Commercial Finance Corporation, formerly known as NationsCredit Commercial Corporation, in respect of the Foothill Loan. The Third Amendment contained the following clauses:

"Borrower and [SPU] have requested that Lender (a) forbear for a limited period of time from exercising any of its rights and remedies with respect to the Existing Defaults, in order to afford Borrower a limited period of time to implement a restructuring of its financial obligations, subject in all events to Lender's prior written consent thereto, and (b) continue to make Revolving Loans and provide Credit Accommodations to Borrower on the basis of Borrower's Budget (as defined below), notwithstanding the continuance of the Existing Defaults, and Lender is willing to agree to the foregoing, on and subject to the terms and conditions contained in this Forbearance Agreement.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree and [*sic*] follows:

- - -

**2. Acknowledgment and Additional Consideration.**

**(a) Acknowledgment of Existing Obligations.** Borrower and [SPU] each hereby acknowledges, confirms and agrees that each is jointly and severally indebted to Lender for the existing Obligations, as of July 5, 2001, consisting of Loans to Borrower made pursuant to the Loan Agreement in the aggregate principal amount of approximately $5,393,658.64 - - - together with interest accrued and accruing thereon - - -.

- - -

**(d) Additional Consideration.** As additional consideration to Lender, and as an inducement to cause Lender to enter into this Forbearance Agreement, [SPU] shall (i) guaranty to Lender the payment of approximately $22.8 million in trade payables currently owed by [JISCO] to Lender in consideration for steel and other goods shipped by Lender to Borrower and (ii) grant to Lender, as security for such guaranty obligations, a security interest in certain assets of [SPU], in the forms of the Guaranty and the Security Agreement attached as Exhibit A and Exhibit B hereto, respectively.

- - -

**3. Forbearance as to Existing Events of Default.**

**(a) Acknowledgment of Default.** Borrower and [SPU] each hereby acknowledges and agrees that the Existing Defaults have occurred and are continuing, each of which constitutes an Event of Default and entitles Lender to exercise its rights and remedies under the Loan Documents (including, without limitation, under the Guarantor Documents), applicable law or otherwise. Lender has not waived, presently does not intend to waive and may never waive such Existing Defaults and nothing contained herein or the transactions contemplated hereby shall be deemed to constitute any such waiver. Each of Borrower and [SPU] hereby acknowledges and agrees that, as a result of the continuance of the Existing Defaults, (i) Lender has the right to declare the Obligations to be immediately due and payable under the terms of the Loan Documents, the Obligations shall bear interest at the rate of interest applicable during the occurrence and continuance of Events of Default, and (iii) notwithstanding anything to the contrary contained in the Loan Agreement or in any of the other Loan Documents, Lender shall have the right to apply, and shall apply, proceeds of Accounts and other Collateral received by Lender at any time, and from time to time, to the payment of the Revolving Loans, the Term Loan, and the other Obligations in such order and amounts as Lender shall determine in its sole discretion.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

**(b) Forbearance**

(i) In reliance upon the representations, warranties and covenants of Borrower and of [SPU] contained in this Forbearance Agreement, and subject to the terms and conditions of this Forbearance Agreement and any documents or instruments executed in connection herewith, Lender agrees to forbear from exercising its rights and remedies under the Loan Documents, applicable law or otherwise, until the earliest of the following dates (the earliest of such dates being referred to herein as the 'Forbearance Termination Date'):

> (A) August 19, 2001, or
> (B) the date of the occurrence of any Forbearance Default.

Borrower and [SPU] acknowledge and agree that (1) Borrower is unable to pay its debts as they become due and does not have sufficient capital to carry on its business as now conducted, (2) has determined to seek to restructure its business and (3) Lender has agreed to forbear, on the terms and conditions set forth herein, solely for the purpose of affording Borrower a limited period of time to consummate such a restructuring.

- - -

**8. Forbearance Default; Remedies.**

(a) The occurrence of any of the following at any time during the Forbearance Period shall constitute a 'Forbearance Default':
(i) Borrower or [SPU] fails to perform any of its respective covenants or agreements or otherwise breaches any of its representations and/or warranties set forth in this Forbearance Agreement; or
(ii) any other Event of Default (other than the Existing Defaults) shall occur.

(b) Immediately upon the occurrence of a Forbearance Default, the Forbearance Period shall be deemed terminated and of no further force and effect.

(c) Upon expiration or termination of the Forbearance Period, Lender shall have the right to immediately exercise, and at any time thereafter, all of Lender's rights and remedies with respect to the Existing Defaults and any other Default or Event of Default that may have occurred and be then continuing, whether under the Loan Agreement, the other Loan Documents or applicable law.

- - -

**11. Effect of this Forbearance Agreement.** Except as modified pursuant hereto, no other changes or modifications to the Loan Agreement and the other Loan Documents are intended or implied and in all other respects the Loan Agreement and the other Loan Documents are hereby specifically ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of any conflict between the terms of this Forbearance Agreement and any of the Loan Documents, the terms of this Forbearance Agreement shall control. The Loan Agreement, the other Loan Documents amended hereby and this Forbearance Agreement shall be read and be construed as one agreement."

Amendment No. 3 was an agreement between KST as Lender and SPU as Borrower and with Denro as Guarantor. KST acted as assignee of Foothill and Banc of America Commercial Finance Corporation in respect of the Foothill Loan. Amendment No. 3 contained the following clauses:

"Borrower and [Denro] have requested that Lender (a) forbear for a limited period of time from exercising any of its rights and remedies with respect to the Existing Defaults, in order to afford Borrower a limited period of time to implement a restructuring of its financial obligations, subject in all events to Lender's prior written consent thereto, and (b) continue to make Revolving Loans and provide Credit Accommodations to Borrower on the basis of Borrower's Budget (as defined below), notwithstanding the continuance of the Existing Defaults, and Lender is willing to agree to the foregoing, on and subject to the terms and conditions contained in this Third Forbearance Agreement.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto hereby agree and [sic] follows:

**2. Acknowledgment and Additional Consideration.**

**(a) Acknowledgment of Existing Obligations.** Borrower and [Denro] hereby each acknowledges, confirms and agrees that each is jointly and severally indebted to Lender for the existing Obligations, as of July 5, 2001, consisting of Loans to Borrower made pursuant to the Loan Agreement in the aggregate principal amount of approximately $328,313.72 - - - together with interest accrued and accruing thereon - - -.

- - -

**(d) Additional Consideration.** As additional consideration to Lender, and as an inducement to cause Lender to enter into this Forbearance Agreement, Borrower shall (i) guaranty to Lender the payment of approximately $22.8 million in trade payables currently owed by [JISCO] to Lender in consideration for steel and other goods shipped by Lender to [Denro] and (ii) grant to Lender, as security for such guaranty obligations, a security interest in certain assets of Borrower, in the forms of the Guaranty and the Security Agreement attached as Exhibit A and Exhibit B hereto, respectively.

- - -

**3. Forbearance as to Existing Events of Default.**

**(a) Acknowledgment of Default.** Borrower and [Denro] each hereby acknowledges and agrees that the Existing Defaults have occurred and are continuing, each of which constitutes an Event of Default and entitles Lender to exercise its rights and remedies under the Loan Documents (including, without limitation, under the Guarantor Documents), applicable law or otherwise. Lender has not waived, presently does not intend to waive and may never waive such Existing Defaults and nothing contained herein or the transactions contemplated hereby shall be deemed to constitute any such waiver. Each of Borrower and [Denro] hereby acknowledges and agrees that, as a result of the continuance of the Existing Defaults, (i) Lender has the right to declare the Obligations to be immediately due and payable under the terms of the Loan Documents, the Obligations shall bear interest at the rate of interest applicable during the occurrence and continuance of Events of Default, and (iii) notwithstanding anything to the contrary contained in the Loan Agreement or in any of the other Loan Documents, Lender shall have the right to apply, and shall apply, proceeds of Accounts and other Collateral received by Lender at any time, and from time to time, to the payment of the Revolving Loans, the Term Loan, and the other Obligations in such order and amounts as Lender shall determine in its sole discretion.

**(b) Forbearance.**

(i) In reliance upon the representations, warranties and covenants of Borrower and of [Denro] contained in this Third Forbearance Agreement, and subject to the terms and conditions of this Third Forbearance Agreement and any documents or instruments executed in connection herewith, Lender agrees to forbear from exercising its rights and remedies under the Loan Documents, applicable law or otherwise, until the earliest of the following dates (the earliest of such dates being referred to herein as the 'Forbearance Termination Date'):

> (A) August 19, 2001, or
> (B) the date of the occurrence of any Forbearance Default.

Borrower and [Denro] acknowledge and agree that (1) Borrower is unable to pay its debts as they become due and does not have sufficient capital to carry on its business as now conducted, (2) has determined to seek to restructure its business, and (3) Lender has agreed to forbear, on the terms and conditions set forth herein, solely for the purpose of affording Borrower a limited period of time to consummate such restructuring.

- - -

**8. Forbearance Default; Remedies.**

(a) The occurrence of any of the following at any time during the Forbearance Period shall constitute a 'Forbearance Default':
(i) Borrower or [Denro] fails to perform any of its respective covenants or agreements or otherwise breaches any of its representations and/or warranties set forth in this Third Forbearance Agreement; or
(ii) any other Event of Default (other than the Existing Defaults) shall occur.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

(b) Immediately upon the occurrence of a Forbearance Default, the Forbearance Period shall be deemed terminated and of no further force and effect.

(c) Upon expiration or termination of the Forbearance Period, Lender shall have the right to immediately exercise, and at any time thereafter, all of Lender's rights and remedies with respect to the Existing Defaults and any other Default or Event of Default that may have occurred and be then continuing, whether under the Loan Agreement, the other Loan Documents or applicable law.

- - -

**11. Effect of this Forbearance Agreement.** Except as modified pursuant hereto, no other changes or modifications to the Loan Agreement and the other Loan Documents are intended or implied and in all other respects the Loan Agreement and the other Loan Documents are hereby specifically ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of any conflict between the terms of this Third Forbearance Agreement and of the Loan Documents, the terms of this Third Forbearance Agreement shall control. The Loan Agreement, the other Loan Documents amended hereby and this Third Forbearance Agreement shall be read and be construed as one agreement."

Also on 5 July 2001, SPU issued a Guaranty for JISCO's obligations to KST in respect of the Trade Payables and concluded, in connection therewith, a Security Agreement with KST. The Preamble of the Security Agreement provided as follows:

"**WHEREAS**, [SPU] is currently indebted to [KST] for certain obligations which are currently due and payable;

**WHEREAS**, [SPU] wishes to induce [KST] to enter into two Forbearance Agreements, pursuant to which [KST] will agree to certain terms and conditions for the benefit of [SPU] and of [Denro], a Delaware corporation - - -, of which [SPU] is a stockholder and certain obligations of which [SPU] has guaranteed; and

**WHEREAS**, as an inducement to [KST] to enter into such Forbearance Agreements, [SPU] has agreed to grant to [KST] a guaranty of even date herewith (the "Guaranty") of certain obligations of [JISCO], a company incorporated in India under the Companies Act, 1956, and having offices at Jindal Mansion, 5A, G. Deshmukh Marg., Mumbai 400026 India - - -, an affiliate of [SPU] and Denro, and the supplier of raw materials to Denro from which [SPU] has received a direct and indirect benefit, and to secure the obligations of [SPU] under such Guaranty by a security interest in certain assets of [SPU];

**NOW, THEREFORE**, in consideration of the foregoing premises, [SPU] hereby agrees as follows:"

According to Section 1 of the Security Agreement, SPU pledged and assigned to KST a security interest in SPU's "now owned and existing and hereafter acquired accounts, goods, inventory, equipment, fixtures, chattel paper, general intangibles, instruments, documents, investment property, real property and other personal property, wheresoever located, together with the proceeds thereof". The Security Agreement also contained the following provisions:

"**SECTION 2.** Security for Obligations. This Agreement secures the payment of approximately all indebtedness, liabilities and other obligations of [SPU] to [KST] under the Guaranty, whether for principal, interest, fees, expenses or otherwise, and all obligations of [SPU] now or hereafter existing under this Agreement (all such obligations of [SPU] being the 'Obligations').

- - -

**SECTION 13.** Remedies. If [SPU] shall default in any of its obligations under the Guaranty (an 'Event of Default') and such Event of Default shall be continuing:

(a) [KST] may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the [Uniform Commercial Code] (whether or not the Code applies to the affected Collateral) and also may (i) require [SPU] to [. . .] and [SPU] hereby agrees that it will at its expense and upon request of [KST] forthwith, assemble all or part of the [. . .]

the Collateral as directed by [KST] and make it available to [KST] at a place to be designated by [KST] which is reasonably convenient to both parties, and (ii) without notice as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale at any of [KST's] offices or elsewhere, - - -.

(b) All cash proceeds received by [KST] in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of [KST], be held by [KST] as collateral for, and/or then or at any time thereafter applied in whole or in part by [KST] against all or any part of the Obligations in such order as [KST] shall elect. Any surplus of such cash or cash proceeds held by [KST] and remaining after payment in full of all the Obligations shall be paid over to [SPU] or to whomever may be lawfully entitled to receive such surplus.

- - -

**SECTION 17.** Subordination. The security interest granted by this Agreement, and the rights and powers of [KST] hereunder, are subordinate in all respects to the rights and powers of [KST], as assignee of and successor in interest to Foothill Capital Corporation and Banc of America Commercial Finance Corporation, formerly known as Nationscredit Commercial Corporation, through its Nationscredit Commercial Funding Division, pursuant to the Security Agreement between such party and [SPU] dated as of June 29, 1998."

On 29 November 2001, the Fourth Amendment to Loan Documents and Forbearance Agreement (*"the Fourth Amendment"*) and Amendment No. 4 to Loan Documents and Forbearance Agreement (*"Amendment No. 4"*) were signed.

The Fourth Amendment was an agreement between KST as Lender and Denro as Borrower and with SPU as Guarantor. The Fourth Amendment extended the Forbearance Termination Date until 13 March 2002. The conditions set out in the Third Amendment were in some respects amended by the Fourth Amendment which also contained the following clauses:

"**5. Payment of Obligations.** Full payment and satisfaction of Borrower's Obligations shall not occur until the indebtedness owed to Lender by Jindal Iron and Steel Company, a company incorporated in India under the Companies Act, 1956 in the amount of $22.8 million for delivered steel and other goods is paid in full.

**6. Covenant to Extend and Restructure.** The parties hereto acknowledge Lender's efforts to assist Borrower in negotiating extended payment terms on the existing trade payables of Borrower to the parties set forth on Schedule D of the Plate Agreement ("Existing Debt"). If, upon expiration of the Forbearance Period, extended payment terms for the Existing Debt have not been finalized but Lender believes in good faith that continued negotiations will within a reasonable period of time result in the finalization of extended payment terms on the Existing Debt, then Lender and Borrower shall negotiate in good faith for an extension to the Forbearance Period in order to provide adequate time to finalize extended payment terms on the Existing Debt. If the Forbearance Period (including any extensions) terminates and Lender believes in good faith that continued negotiations will not result within a reasonable period of time in extended payment terms on the Existing Debt, then, subject to the review and approval of Hermes Kreditversicherungs-AG, Lender acknowledges and agrees to reschedule the Obligations, including the $22.8 million payable referred to in Section 5, pursuant to an amortization schedule ending December 31, 2008.

**7. Consideration.** As consideration to Lender, and as an inducement to cause Lender to enter into this Forbearance Agreement, Borrower shall enter into the Plate Agreement."

Amendment No. 4 was an agreement between KST as Lender and SPU as Borrower and with Denro as Guarantor. It extended the Forbearance Termination Date until 13 March 2002. The conditions set out in Amendment No. 3 were in some respects amended by Amendment No. 4 which also contained clauses similar to those of the Fourth Amendment quoted above, the essential difference being, however, that references were made to the Pipe Agreement, i.e. the Master Pipe Conversion Agreement, instead of the Plate Agreement, i.e. the Master Plate Conversion Agreement (as to these two Agreements, see below).

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

On the same day, i.e. 29 November 2001, the two Conversion Agreements were concluded in order to implement the envisaged co-operation between the Balli companies and the Jindal companies. One of the agreements, to which Denro and the Balli company Southern Texas Steel ("*STS*") were parties, was called *Master Plate Conversion Agreement* and concerned co-operation in converting steel slabs into rolled steel plates. The other one, to which SPU and STS were parties, was called *Master Pipe Conversion Agreement* and concerned co-operation in converting steel plates into rolled steel pipes. The Conversion Agreements contained, *inter alia*, the following provisions:

### *Master Plate Conversion Agreement:*

"**WHEREAS**, STS engages in the trade of steel products;

**WHEREAS**, for the Term (as defined herein) of this Agreement, STS desires to engage [Denro] to convert STS's steel slabs into rolled steel plates; and

**WHEREAS**, [Denro] has the knowledge, facilities and ability to perform such conversion at its Plant (as defined herein), upon the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants herein contained, STS and [Denro] hereby agree as follows:

- - -

AGREEMENT

1. Definitions. As used in this Agreement, the following terms shall have the meanings ascribed to them below:

- - -

(g) "Converted Plates" shall mean those rolled steel plates converted from the Steel Slabs pursuant to this Agreement.

- - -

(u) "Repayment Obligations" shall mean those repayment obligations of [Denro] set forth on Schedule D hereto.

- - -

(x) "Steel Slabs" shall mean the steel slab materials provided by STS to [Denro] pursuant to this Agreement.

- - -

2. Engagement of [Denro]. Subject to the terms and conditions contained in this Agreement, STS hereby engages [Denro] to convert the Steel Slabs into Converted Plates, when and as ordered by STS in accordance with the terms of this Agreement, and [Denro] hereby accepts such engagement.

- - -

7. Marketing and Sales.

(a) [Denro] hereby engages STS to serve as its sales agent and representative for the promotion, marketing, solicitation of orders for and sale of steel plates and Steel Scraps. STS shall conduct such marketing and sales efforts in accordance with [Denro's] marketing policies and all applicable legal requirements.

(b) [Denro] acknowledges STS will expend significant resources in promoting, marketing, soliciting orders for and selling steel plates and Steel Scraps on [Denro's] behalf. In consideration thereof, [Denro] shall coordinate all its marketing activities and efforts. To the extent requested by STS, [Denro] shall provide all reasonable

cooperation for STS's marketing efforts, including, without limitation, access to information regarding, and introductions to, customers of [Denro], provision of information needed for sales and marketing efforts, provision of [Denro's] sales forms, product brochures, advertising literature, and other product materials for STS's use in promoting and soliciting orders, permitting and facilitating quality inspections, and handling customer claims.

- - -

11. Consideration; Payment.

(a) As consideration for [Denro's] performance of its obligations hereunder, STS shall in each month of the Term pay to the order of [Denro] a portion of the proceeds of sale of Converted Plates and Steel Scraps realized by STS during the preceding month, as determined below.

(b) Proceeds from the sale of steel plates, Converted Plates and Steel Scraps by STS or [Denro] in the preceding month shall be applied and paid by STS in the following manner:
(i) First, to cover the operating costs of STS for such month, which shall not exceed 1.5% of the total sales of Converted Plates and Steel Scraps of such month;
(ii) Second, to cover the costs of procuring Steel Slabs needed for the Converted Plates sold during such month;
(iii) Third, to [Denro] in an amount equal to the Production Costs during such month, provided that the amount paid to [Denro] under this Section 11(b)(iii) shall not exceed 110% of the amounts set forth in the applicable Budgets in a calendar quarter;
(iv) Fourth, 75% of the remainder to [Denro], to fund the Reserve Account, but only to the extent needed to assure that the Reserve Account includes at least $5,000,000; and
(v) Fifth, at any time at which the Reserve Account includes at least $5,000,000, 75% of the remainder to [Denro], to be paid into a lockbox account jointly established by [Denro] and STS pursuant to a Lockbox Agreement of even date herewith, the proceeds of which are to be used to fund the Repayment Obligations.

The remainder of the proceeds shall be retained by STS.

(c) At such time when the proceeds in the Reserve Account are sufficient to fully pay and satisfy the Repayment Obligations, then [Denro] and STS shall take all necessary actions to effect such payment. Any proceeds remaining in the Reserve Account after the full payment and satisfaction of the Repayment Obligations shall be for the account of [Denro] and [SPU].

(d) All amounts due under this Section 11 shall be paid by STS to [Denro] on the eighth day of each month in consideration for the Converted Plates and Steel Scraps delivered the previous month.

- - -

15. Term and Termination.

(a) The term of this Agreement (the 'Term') shall be from the date hereof until the later of (i) September 30, 2011, or (ii) the date which is two years after the Repayment Obligations have been fully paid and satisfied, unless the Agreement is terminated earlier pursuant to this Section 15.

- - -

18. [Denro's] Covenants. [Denro] hereby covenants that during the Term it shall:

(a) Have and maintain the necessary expertise, personnel, facilities, permits and equipment to convert the Steel Slabs in accordance with, and to perform its other obligations arising under or out of, this Agreement;

(b) Operate and maintain its premises, plant and machinery, equipment related to the Steel Slabs, Steel Scraps and Converted Plates in compliance with all applicable laws and in accordance with good business practices so as to reasonably ensure the continued ability to meet [Denro's] obligations under this Agreement;

(c) Maintain in effect umbrella liability, product liability, casualty, business interruption and other insurance in amounts not less than those set forth on Schedule H hereto, with carriers reasonably acceptable to STS, pursuant

to policies that name STS as an additional insured (to the extent STS has an insurable interest) and specify that they cannot be terminated or modified without prior notice to STS;

(d) Pay all income, real property, personal property, and franchise taxes when and as due; provided, however, [Denro] defer payment of any contested taxes if [Denro] (i) in good faith contests the obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies STS in writing of the commencement of, and any material development in, the proceedings; (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a lien upon its property; and (iv) maintains adequate reserves therefor in conformity with GAAP.

(e) Not merge or consolidate with any other person or entity, or sell all or any portion of its business or assets (other than the sale of inventory in the ordinary course of business in accordance with this Agreement);

(f) Without the prior written consent of STS, and except for restructuring the Repayment Obligations, not incur any Debt;

- - -

21. Relationship of the Parties. The employees, methods of operation, methods of doing business, equipment and facilities used by [Denro] shall at all times be under the exclusive control and direction of [Denro]. [Denro's] relationship with STS is that of independent contractor, and nothing contained herein shall be construed to constitute or create the relationship of employer and employee, agent and principal, partnership or joint venture as between STS, on the one hand, and [Denro] or any of its employees on the other."

Schedule D to which reference is made in Section 1 (u) contains, in respect of Denro, a Payables Summary as of 20 October 2001. The Summary includes, as regards KST, $22,852,274.26 for the Trade Payables and $5,278,579.93 as "Payoff Foothill".

*Master Pipe Conversion Agreement:*

"**WHEREAS,** STS engages in the trade of steel products;

**WHEREAS,** for the Term (as defined herein) of this Agreement, STS desires to engage [SPU] to convert STS's steel plates into rolled steel pipes; and

**WHEREAS,** [SPU] has the knowledge, facilities and ability to perform such conversion at its Plant (as defined herein), upon the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the foregoing premises and the mutual covenants herein contained, STS and [SPU] hereby agree as follows:

AGREEMENT

1. Definitions. As used in this Agreement, the following terms shall have the meanings ascribed to them below:

- - -

(g) "Converted Pipes" shall mean those rolled steel pipes converted from the Steel Plates pursuant to this Agreement.

- - -

(t) "Repayment Obligations" shall mean those repayment obligations of [SPU] set forth on Schedule D hereto.

- - -

(x) "Steel Plates" shall mean the steel plates provided by STS to [SPU] pursuant to this Agreement.

- - -

2. Engagement of [SPU]. Subject to the terms and conditions contained in this Agreement, STS hereby engages [SPU] to convert the Steel Plates into Converted Pipes, when and as ordered by STS in accordance with the terms of this Agreement, and [SPU] hereby accepts such engagement.

- - -

7. Marketing and Sales.

(a) [SPU] hereby engages STS to serve as its sales agent and representative for the promotion, marketing, solicitation of orders for and sale of steel plates and Steel Scraps. STS shall conduct such marketing and sales efforts in accordance with [SPU's] marketing policies and all applicable legal requirements.

(b) [SPU] acknowledges STS will expend significant resources in promoting, marketing, soliciting orders for and selling steel plates and Steel Scraps on [SPU's] behalf. In consideration thereof, [SPU] shall coordinate all its marketing activities and efforts. To the extent requested by STS, [SPU] shall provide all reasonable cooperation for STS's marketing efforts, including, without limitation, access to information regarding, and introductions to, customers of [SPU], provision of information needed for sales and marketing efforts, provision of [SPU's] sales forms, product brochures, advertising literature, and other product materials for STS's use in promoting and soliciting orders, permitting and facilitating quality inspections, and handling customer claims.

- - -

11. Consideration; Payment.

(a) As consideration for [SPU's] performance of its obligations hereunder, STS shall in each month of the Term pay to the order of [SPU] a portion of the proceeds of sale of Converted Pipes and Steel Scraps realized by STS during the preceding month, as determined below.

(b) Proceeds from sale of steel pipes, Converted Pipes and Steel Scraps by STS or [SPU] in the preceding month shall be applied and paid by STS in the following manner:
(i) First, to cover the operating costs of STS for such month, which shall not exceed 1.5% of the total sales of Converted Pipes and Steel Scraps of such month;
(ii) Second, to cover the costs of procuring Steel Plates needed for the Converted Pipes sold during such month;
(iii) Third, to [SPU] in an amount equal to the Production Costs during such month, provided that the amount paid to [SPU] under this Section 11(b)(iii) shall not exceed 110% of the amounts set forth in the applicable Budgets in any calendar quarter;
(iv) Fourth, 75% of the remainder to [SPU], to fund the Reserve Account, but only to the extent needed to assure that the Reserve Account includes at least $5,000,000; and
(v) Fifth, at any time at which the Reserve Account includes at least $5,000,000, 75% of the remainder to [SPU], to be paid into a lockbox account jointly established by [SPU] and STS pursuant to a Lockbox Agreement of even date herewith, the proceeds of which are to be used to fund the Repayment Obligations.

The remainder of the proceeds shall be retained by STS.

(c) At such time when the proceeds in the Reserve Account are sufficient to fully pay and satisfy the Repayment Obligations, then [SPU] and STS shall take all necessary actions to effect such payment. Any proceeds remaining in the Reserve Account after the full payment and satisfaction of the Repayment Obligations shall be for the account of [Denro] and [SPU].

(d) All amounts due under this Section 11 shall be paid by STS to [SPU] on the eighth day of each month in consideration for the Converted Pipes and Steel Scraps delivered the previous month.

- - -

15. Term and Termination.

(a) The term of this Agreement (the 'Term') shall be from the date hereof until the later of (i) September 30, 2011, or (ii) the date which is two years after the Repayment Obligations have been fully paid and satisfied, unless the Agreement is terminated earlier pursuant to this Section 15.

COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

- - -

18. [SPU's] Covenants. [SPU] hereby covenants that during the Term it shall:

(a) Have and maintain the necessary expertise, personnel, facilities, permits and equipment to convert the Steel Plates in accordance with, and to perform its other obligations arising under or out of, this Agreement;

(b) Operate and maintain its premises, plant and machinery, equipment and procedures related to the Steel Plates, Steel Scraps and Converted Pipes in compliance with all applicable laws and in accordance with good business practices so as to reasonably ensure the continued ability to meet [SPU's] obligations under this Agreement;

(c) Maintain in effect umbrella liability, product liability, casualty, business interruption and other insurance in amounts not less than those set forth on Schedule H hereto, with carriers reasonably acceptable to STS, pursuant to policies that name STS as an additional insured (to the extent STS has an insurable interest) and specify that they cannot be terminated or modified without prior notice to STS;

(d) Pay all income, real property, personal property, and franchise taxes when and as due; provided, however, [Denro] may defer payment of any contested taxes; if [Denro]: (i) in good faith contests [Denro's] obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies STS in writing of the commencement of, and any material development in, the proceedings; (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a lien upon its property; and (iv) maintains adequate reserves therefor in conformity with GAAP.

(e) Not merge or consolidate with any other person or entity, or sell all or any portion of its business or assets (other than the sale of inventory in the ordinary course of business in accordance with this Agreement);

(f) Without the prior written consent of STS, and except for restructuring the Repayment Obligations, not incur any Debt;

- - -

21. Relationship of the Parties. The employees, methods of operation, methods of doing business, equipment and facilities used by [SPU] shall at all times be under the exclusive control and direction of [SPU]. [SPU's] relationship with STS is that of independent contractor, and nothing contained herein shall be construed to constitute or create the relationship of employer and employee, agent and principal, partnership or joint venture as between STS, on the one hand, and [SPU] or any of its employees on the other."

Schedule D to which reference is made in Section 1 (t) contains, in respect of SPU, a Payables Summary as of 20 October 2001. The Summary includes for KST $329.738.80 as "Payoff Foothill".

On 4 April 2002, two further agreements were signed, i.e. the Fifth Amendment to Loan Documents and Forbearance Agreement ("the Fifth Amendment") and Amendment No. 5 to Loan Documents and Forbearance Agreement ("Amendment No. 5"). The Fifth Amendment and Amendment No. 5 extended the Forbearance Termination Date until 14 June 2002. They also contained clauses about payment of obligations (Section 5) and about possible restructuring of the obligations for the period until 31 December 2008 (Section 6) of the same wording as the corresponding clauses in the Fourth Amendment and Amendment No. 4.

On 8 November 2002, First Amendments to the Master Plate Conversion Agreement and the Master Pipe Conversion Agreement were signed by the parties concerned. The reason for these Amendments was that the parties wished to treat depreciation as a cost of production which should be added to the list of such costs in Schedule E to the Agreements. The Amendments read in relevant parts:

"**2. Amendment**. The Agreement shall be amended by deleting Schedule E to the Agreement, captioned "Production Costs," in its entirety and inserting in lieu thereof the Schedule E attached hereto, which shall constitute Schedule E to the Agreement.

**3. Calculation of Depreciation**. For all purposes under the Agreement as amended by this Amendment, "Depreciation" will be calculated based on units of production and straight line method in accordance with GAAP as consistent with past practices during prior years.

**4. Effective Date of Amendment**. The parties hereto hereby acknowledge and agree that this Amendment shall be effective as to each of the parties and their respective permitted successors and assigns as of the date 1st July 2001."

Unlike the previous Schedule E, the Schedule attached to the Amendment includes "Depreciation" as one of the items of Cost of Production.

On 29 May 2003, a further Memorandum of Understanding (*"the 2003 MoU"*) was signed on behalf of KST and other Balli companies, on the one hand, and Denro and SPU, on the other hand. The 2003 MoU contained the following text:

"This Memorandum of Understanding reflects the intent of the parties (Jindal and Balli) after their meeting held at 5 Stanhope Gate, London on May 28 and May 29, 2003. - - -

**Preamble**

Jindal United Steel Corporation and Saw Pipes USA, Inc. (collectively known as 'JINDAL') and Balli Klockner GMBH (formerly known as Klockner Steel Trade, GMBH) and Southern Texas Steel, LLC, Balli Klockner Inc. and Balli North America (collectively known as BALLI) had got into some definitive documents including the Fourth Amendment to the Forbearance Agreement dated November 29, 2001, Master Plate Conversion Agreement, Master Pipe Conversion Agreement and other operating and security agreements relating to the repayment obligations of the Foothill Capital Corporation Loan, the trade payables and the management of the operations of the Jindal Pipe and Plate mill located at Baytown, Texas, U.S.A.

JINDAL and BALLI got together to review the entire arrangement and notwithstanding anything contained in any of the definitive documents referred above have reached the understanding of carrying out the operations and continuing the relationship forward. Based on this Memorandum of Understanding both parties would endeavour to convert the same in definitive legal binding documents as soon as practicable. If the terms of this understanding conflict with any other terms of any other commercial agreement entered into by the parties, each party will notify the other party immediately, meet and endeavour to resolve the issues.

Now, therefore the following reflects the understanding reached between both the parties.

**1. REPAYMENT OBLIGATION:** Based on the assignment of Foothill Capital Corporation loan to BALLI and the trade payables owed by JINDAL to BALLI a total repayment obligation had arisen as per the forbearance agreement referred above. This resulted in BALLI liquidating the JINDAL inventory and receivables existing prior to the arrangement entered with BALLI. The amount so realised by BALLI is approximated $14 Million (United States Dollars Fourteen Million). It is intended that this amount so realized by BALLI be set off against the JINDAL repayment obligation and the encumbrance on the security provided be reduced by the same amount.

**2. TOLLING FEES:** JINDAL and BALLI would reconcile all the money paid by BALLI to JINDAL over the period of time with the invoices of JINDAL to BALLI for the tolling fees. Any excess funds received by JINDAL would be treated as an advance tolling fee from BALLI to JINDAL and the same would be adjusted in future orders.

**3. RECONCILIATION OF ACCOUNTS:** Both parties agree to reconcile the books of accounts covering all the transactions in line with the agreements.

**4. BOOK LOSSES OF SOUTHERN TEXAS STEEL, LLC:** Both parties agree to identify the causes of the occurrence of loss and both parties agree to take care of their portion of loss by reaching an amicable settlement.

**5. FUTURE COURSE OF ACTION:** It has been agreed by both the parties that they would co-ordinate better in carrying out the operations forward in the following manner:

- - -

All the above has been acknowledged and agreed by respective parties and signed hereto as the acceptance of this Memorandum of Understanding."

Denro and SPU have instituted litigation against KST and other Balli companies before a court in Texas. In these proceedings, KST, as a counterclaim, has demanded payment of the Foothill Loan and the Trade Payables from Denro and SPU as guarantors.

## 2. Proceedings

On 21 April 2004, KST submitted its Request for Arbitration against JISCO to the Secretariat of the ICC International Court of Arbitration.

On 29 June 2004, JISCO submitted its response in which it raised objections against the Arbitral Tribunal's jurisdiction. KST submitted comments on 2 July 2004, and JISCO responded on 12 July 2004.

As arbitrators in this case were nominated by KST Mr. Robert L. Simpson, Jr. and by JISCO Professor Abraham D. Sofaer. Mr. Simpson and Mr. Sofaer jointly nominated as third arbitrator and chairman of the Arbitral Tribunal Mr. Hans Danelius, former Justice of the Supreme Court of Sweden.

On 23 July 2004, the ICC International Court of Arbitration, being *prima facie* satisfied that an arbitration agreement under the ICC Rules of Arbitration might exist, decided that the arbitration should proceed but that, this decision being administrative in nature, the Arbitral Tribunal must still decide on its own jurisdiction in accordance with Article 6(2) of the Rules.

On the same date, the ICC International Court of Arbitration, pursuant to Article 9(2) of the ICC Rules of Arbitration, confirmed Mr. Robert L. Simpson and Professor Abraham D. Sofaer as arbitrators. On 27 September 2004, the Secretary General of the ICC International Court of Arbitration, pursuant to the same Article, confirmed Mr. Hans Danelius as chairman of the Arbitral Tribunal.

On 27 September 2004, the Secretariat of the ICC International Court of Arbitration forwarded the file to the Arbitral Tribunal. Terms of Reference were signed by the arbitrators and counsel for both parties in November 2004. They were signed on different dates, but the date of the two last signatures was 19 November 2004.

In a brief submitted on 11 October 2004 and entitled "Respondent's Statement of Positions on Claimant's Claims and Challenge to the Jurisdiction", JISCO requested that the Arbitral Tribunal declare that it has no jurisdiction over the claims in this case. JISCO repeated this request in a submission to the Arbitral Tribunal of 8 December 2004. JISCO also requested that the jurisdictional issues should be dealt with separately as a first phase of the proceedings.

On 25 October 2004, KST responded to JISCO's brief of 11 October 2004. On 9 December 2004, KST made further comments and accepted JISCO's request that the question of arbitral

jurisdiction should be dealt with in a first and separate phase but suggested that the jurisdictional issues to be examined at this stage should be limited to specific matters relating essentially to KST's standing as Claimant and JISCO's standing as Respondent.

On 13 December 2004, the Arbitral Tribunal rendered a Procedural Order in which it accepted the parties' agreement about a separate jurisdictional phase of the proceedings and specified the issues that were to be dealt with during that phase.

On 31 January 2005, the parties submitted briefs on the jurisdictional issues set out in the Procedural Order. Further memorials were submitted on 25 April 2005 by JISCO and on 29 April 2005 by KST.

On 21 April 2005, KST requested the Arbitral Tribunal's permission for Stanhope Services GmbH to join the proceedings. On 29 April 2005, JISCO stated that it did not consent to KST's request and asked the Arbitral Tribunal to reject it. On 2 May 2005, the Arbitral Tribunal, referring to various elements and taking into account, in particular, JISCO's objections, decided to reject KST's request.

On 13 May 2005, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 31 August 2005.

On 4-6 June 2005, an oral hearing on jurisdictional issues was held in Stockholm.

In a decision of 8 July 2005, the Arbitral Tribunal ruled on the various jurisdictional issues and decided to proceed to an examination of the remaining issues in the case.

The parties submitted their views on the further procedure, KST on 15 July 2005 and JISCO on 18 July 2005.

On 24 July 2005, the Arbitral Tribunal issued a Procedural Order setting out a schedule for the substantive phase of the proceedings. This schedule was amended by the Arbitral Tribunal on 6 September 2005.

On 12 August 2005, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 30 November 2005.

On 31 August 2005, KST filed its First Brief on the Merits. On 14 October 2005, JISCO filed its Opening Memorial on the Merits.

On 4 November 2005, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 28 February 2006.

On 9 January 2006, JISCO informed the Arbitral Tribunal that, in order to simplify the remaining procedure, JISCO wished to eliminate or narrow certain defenses and, for this purpose, asked to be allowed to submit an Amended Opening Memorial on the Merits. This was accepted by the Arbitral Tribunal in a Procedural Order of 11 January 2006 which contained a new timetable for the further written procedure in this case.

On 16 January 2006, JISCO submitted the Amended Opening Memorial on the Merits.

Further briefs on the merits were submitted by KST on 30 January 2006 and by JISCO on 9 March 2006.

On 2 February 2006, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 31 May 2006.

On 17 March 2006, KST withdrew its requests that the Arbitral Tribunal should find itself not to have competence to determine certain issues regarding the relations between KST, on the one hand, and SPU and Denro as guarantors, on the other hand.

A final hearing was held in Stockholm on 27-30 March 2006. At the hearing, the parties were represented:
– KST by Mr. Mikael Broomé, Mr. B. Edward Williamson and Mr. Ola Sandersson as counsel, and
– JISCO by Mr. Allan Van Fleet, Mr. James L. Loftis, Mr. Kaj Hobér and Mr. Alexander Foerster as counsel.

The following persons were heard:
– at KST's request: Mr. Nasser Alaghband, Mr. Vahid Alaghband, Mr. George Banks, Ms. Hally Ervine, Mr. Ralf Oberhuber, Mr. Udo Weinem and Mr. Holger Ehrich, and
– at JISCO's request: Mr. Indresh Batra, Mr. P.K. Rahlon, Mr. Beat Frei, Mr. Richard Hoban and Mr. Jürgen Vogt.

On 13 April 2006, both parties submitted calculations of interest on claimed amounts as well as certain other materials.

On 24 April 2006, both parties submitted their cost claims. On 28 April 2006, they commented on each other's claims.

Pursuant to Article 22 of the ICC Arbitration Rules, the Arbitral Tribunal declared the proceedings closed as from 29 April 2006.

On 12 May 2006, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 31 August 2006.

Although the proceedings had been closed, the parties, during June and July 2006, made submissions regarding party substitution on Respondent's side. On 26 June 2006, KST made a request for party substitution in the Final Award. On 10 July 2006, counsel for JSW Steel submitted a stipulation regarding this issue. On 11 July 2006, KST made further submissions on the same issue. On the same day, KST submitted an additional cost claim, which was contested by Respondent on 14 July 2006. On 28 July 2006, counsel for Respondent submitted a letter from JSW Steel, dated 26 July 2006 and confirming Mr. Allan Van Fleet's engagement to represent JSW Steel in connection with the subject matter in the International Chamber of Commerce International Court of Arbitration and other related proceedings.

On 11 August 2006, the ICC International Court of Arbitration extended the time-limit for rendering the Final Award until 30 November 2006.

### 3. Claims

*KST* requested the Arbitral Tribunal

(i) to order JISCO to pay KST $22,820,310.53 for steel slabs delivered by KST to JISCO in 2000 (the Trade Payables),

(ii) to order JISCO to pay interest on the Trade Payables from the due dates until date of payment at an interest rate being 3 per cent over the official rate of discount of the Deutsche Bundesbank according to the following schedule:

– on $4,571,484.74 as from 6 September 2000,
– on $2,066,109.46 as from 24 September 2000,
– on $3,791,710.84 as from 1 November 2000,
– on $3,917,911.91 as from 7 December 2000,
– on $1,348,998.49 as from 14 January 2001,
– on $3,007,856.40 as from 28 January 2001, and
– on $4,116,238.69 as from 6 March 2001,

(iii) to order JISCO to compensate KST for its cost of arbitration together with interest thereon, at a rate corresponding to the Swedish official reference rate plus eight percentage units per year, from the date of the award until full payment, and

(iv) to order that, as between the parties, JISCO shall be solely liable for the fees and expenses of the Arbitral Tribunal and the ICC International Court of Arbitration.

*JISCO* contested the claims and requested the Arbitral Tribunal to award no relief to KST and

(a) to find that KST has received from Denro and SPU $14,508,623 from liquidation of their pre-joint venture receivables and inventory,

(b) to find that the liquidation funds received by KST reduced the Trade Payables debt to a principal amount of $8,343,650,

(c) to find that accrued interest on that debt to 30 September 2005 is $3,106,899,

(d) to find that the total balance owed on the Trade Payables, as of 30 September 2005, is $11,450,549,

(e) to find that KST has agreed to reschedule collection of the Trade Payables on an amortization schedule extending through 31 December 2008,

(f) to order that KST may not institute any collection proceedings on the balance of the Trade Payables, including any attempt to foreclose on any security for same, prior to 31 December 2008,

(g) to order that if the balance of the Trade Payables, plus any interest accrued hereafter, is not paid in full by JISCO, Denro, SPU or a designate of JISCO, on or before 31 December 2008, then JISCO shall pay at that time the remaining balance of $11,450,549 plus all interest accrued from 30 September 2005 at the rate specified in the Order Confirmations, and

(h) to grant JISCO compensation for its costs of arbitration and legal costs from KST.

KST subsequently requested that the Arbitral Tribunal substitute JSW Steel for JISCO in the Final Award.

Respondent stipulated that JSW Steel could be substituted for JISCO in the Award, subject to and without waiver of any objections JISCO has to the Arbitral Tribunal's jurisdiction, which objections could be asserted by JSW Steel.

KST made an additional claim for compensation for legal costs which was contested by Respondent.

## 4. **Arguments**

Despite the merger of JISCO into JVSL and the change of JVSL's name to JSW Steel, JISCO appeared until the very last stage of the arbitration proceedings as Respondent in this case. The Arbitral Tribunal was not informed of the changes that had occurred, and Respondent's counsel continued to act as the representative of JISCO notwithstanding the fact that JISCO had ceased to exist as a legal entity at an early stage of the proceedings and that its obligations had been taken over by JVSL, subsequently renamed JSW Steel. In these circumstances, the Arbitral Tribunal finds it appropriate, and consistent with the way the proceedings were in fact conducted, to maintain references to JISCO in the following summary of the parties' arguments under (a) of this Section, and to deal separately under (b) of this Section with the parties' arguments regarding party substitution.

### *(a) Payment obligations*

The parties agree that the only disputed issues to be decided in this award are

(a) whether KST's claims relating to the Trade Payables should be reduced by an amount of approximately $14,5 million received by KST from liquidation of Denro's and SPU's receivables and inventory, and

(b) whether KST has agreed to reschedule collection of the Trade Payables or the remaining part of the Trade Payables on an amortization schedule extending through 31 December 2008.

The parties' arguments on these issues may be summarized as follows:

### *KST:*

In 2000, JISCO sent KST in total five orders for steel slabs delivery. The total price was $23,460,310.53. The steel slabs were delivered in accordance with the agreement between the parties to Denro. There were seven deliveries between April and October 2000. For each delivery, one invoice was sent.

JISCO has paid in total $640,000 (two payments: one of 31 August 2000 of $40,000 and one on 21 December 2000 of $600,000). The remaining amount of $22,820,310.53 has still not been paid

JISCO is the primary obligor on the Trade Payables at issue in this case. JISCO's affiliates Denro and SPU guaranteed payment of the Trade Payables to KST. Litigation is going on in Texas involving, *inter alia*, the amount of Trade Payables guaranteed by SPU and Denro. In connection with that case, KST engaged the international accounting firm Grant Thornton, LLP (*"Grant Thornton"*) to investigate and account for the business activities of KST with Denro and SPU. In its Report (*"the GT Report"*), Grant Thornton concluded that as of 30 September 2005, Denro was indebted to KST for $22,852,274 in principal for the Trade Payables (which Denro guaranteed), plus accrued interest as of 30 September 2005 in the amount of $5,729,018, for a total of $28,581,292, after providing all credits to which Denro is entitled pursuant to the contracts. The amounts calculated to be due and owing from Denro for the Trade Payables are jointly owed by JISCO, the primary obligor, on the Trade Payables. Thus, KST is entitled to recover $22,820,310.53 plus interest from JISCO.

JISCO, Denro and SPU have received all credits to which they are entitled. The total amount computed to be due in the GT Report includes the appropriate offsets and credits to JISCO based on the liquidation of inventory and receivables. Therefore, the GT Report reflecting the amounts owed on the Trade Payables is an accurate account of what remains due and payable.

*Relevant facts*

In the spring of 2001, at the direction of JISCO, representatives of KST met with Denro to discuss payment of the Trade Payables. Jindal made a written proposal involving payment over time and supplying additional slabs at a discount. However, unknown to KST, Denro's financial problems were so severe that it could not even expect to fulfil the terms of its own compromise proposal. Denro had very little liquid assets but owed $51 million for raw materials, owed $25 million to its shareholder Jindal Enterprises for a loan from Standard Chartered Bank, owed more than $5 million to Foothill, and owed more than $2 million to various vendors. SPU (which depended on Denro for its supply of raw materials) was also in dire straits. The failures by Denro and SPU to pay various vendors had led them to the brink of a virtual shut down of operations.

In May 2001, Vahid Alaghband met with P.R. Jindal to discuss the Trade Payables situation. Mr. Jindal disclosed that his organisation was under tremendous pressure from Foothill, which was threatening to foreclose on the pipe mill. He further advised that a prospective sale by SPU of the pipe mill to the company EuroPipe had fallen through. In essence, Mr. Jindal was advising that, absent some intervention by Balli, KST could not expect to be paid due to Denro's financial distress. Mr. Alaghband replied that, even though the Jindal organization might be looking to Denro for payment of the Trade Payables, KST was also looking to JISCO which was the buyer and primary obligor. Mr. Jindal stated that JISCO would also present collection difficulties. For example, he told Mr. Alaghband that JISCO would take the position that its representative in India, Mr. Nangalia, did not have authority to bind JISCO for payment, since the slabs were sent to the United States. Mr. Jindal further threatened that JISCO would contend that it was precluded by Indian regulations from making payment for goods which were not imported into India.

Mr. Jindal then suggested that he felt things could be turned around in the United States for various reasons, including that he had recently changed management. Mr. Jindal ultimately convinced Mr. Alaghband that it might be in KST's best interest to assist the Jindal organization in working its way out of its debts, including the Trade Payables.

During this period of time, Denro and SPU were in default with respect to the Foothill Loan. As part of the attempt to assist Denro and SPU in working out of their extreme financial distress, Mr. Alaghband, at Mr. Jindal's request, instructed Balli's attorneys, Covington and Burling, to contact Foothill to agree to a voluntary standstill while Balli gave consideration to acquiring the Foothill Loan. Mr. Alaghband went to Germany to speak to Klöckner & Co. concerning the workout arrangement proposed by Mr. Jindal. It was clear that additional funds would be required if any such workout could succeed. Klöckner & Co. and its parent E.ON A.G. agreed that Klöckner & Co. would lend $8.5 million to KST. In turn KST used those funds to acquire the Foothill Loan and also made advances to Denro and SPU to pay other current obligations. KST put these funds at risk to protect against foreclosure of the mills and to allow continued operation of the mills. KST acquired the Foothill Loan and the security for it, which included the pipe mill and all equipment, inventory and receivables of SPU, as well as inventory and receivables of Denro. As consideration for KST's acquisition of the Foothill Loan and for KST granting SPU and Denro, *inter alia*, extension of payment terms hereof according to certain forbearance agreements, SPU guaranteed the Trade Payables and cross-collateralized the Trade Payables with the same debt securing payment of the loans. KST paid Foothill approximately $5.7 million, which corresponded to the principal balance of the Foothill Loan at that time.

On 8 June 2001, the parties signed the 2001 MoU documenting their intent to negotiate towards a business arrangement whereby Jindal would be able to work its way out of debt by having Denro process slabs provided by Balli into steel plate and having SPU process a portion of the plates into steel pipe. The plan was to try to reach definitive agreements whereby the "converted" plates and pipe would be sold at a profit, 25% of which would be retained by the Balli organization and 75% of which would go to pay off the Trade Payables to KST and to pay Denro's and SPU's other trade creditors. The 2001 MoU provided that it was not a binding obligation but only a documentation of the "current intent" of the parties.

The Conversion Agreements, executed in November 2001, were the definitive agreements setting forth the rights and obligations of the parties concerning the workout arrangement. They were part of the attempt to assist Denro and SPU to work out their extreme financial distress. The Master Plate Conversion Agreement was an agreement between Denro and STS. The Master Pipe Conversion Agreement was an agreement between SPU and STS. Neither KST nor JISCO was a party to either of these Conversion Agreements.

At the end of May 2003, the parties met in London to discuss the status and the future of the workout arrangement. They signed the 2003 MoU to document these discussions. The parties clearly recognized that a financial accounting of their affairs was in order. However, in early August 2003, before a reconciliation of the financial affairs could be accomplished, Denro and SPU abruptly terminated their Conversion Agreements, filed a lawsuit in a Texas court, and seized STS's inventory at their mills.

After the litigation was instituted, KST engaged Grant Thornton to review the financial transactions between the parties, in accordance with their contractual obligations, to determine the amounts owing to one another. After an extensive analysis of the financial books and records of the parties and their contracts with one another, Grant Thornton issued its report, in which it concluded that, as of 30 September 2005, for both the Trade Payables and loans, Denro owed KST $38.4 million ($30 million in principal and $8.4 million in interest).

In addition to the loans made by KST to Denro and SPU, which are not the subject of this arbitration, Grant Thornton also specifically reviewed the Trade Payables. Grant Thornton recognized the credits to which Denro and SPU were entitled from the collection of receivables and the sale of inventory belonging to Denro and SPU. Grant Thornton concluded that the amount due and owing from JISCO to KST is $28,581,292.

*Should the amount of the Trade Payables be reduced?*

The first question to be examined by the Arbitral Tribunal at this stage is whether the Trade Payables should be reduced with an amount corresponding to what has been obtained by liquidation of Denro's and SPU's receivables. KST considers that this is not the case. JISCO's payment obligation has not been reduced by any actions taken after the payments on 31 August and 21 December 2000. KST has not received any funds at all from liquidation of inventory or receivables that should be applied against the Trade Payables.

Upon acquisition of the Foothill Loan, KST also took over a lockbox account which had been utilized by Foothill for the deposit of collections of Denro's and SPU's receivables. KST does not dispute that an approximate amount of $5.7 million from existing accounts receivable of Denro and SPU was in fact collected, but KST disputes that Denro and SPU were not given credit for these receipts. Pursuant to Section 3.1 of the Loan and Security Agreements regulating the Foothill Loan, the receivables of Denro and SPU served as security for repayment of the Foothill Loan. Section 4.3 of the Loan and Security Agreements provided that KST could "in its sole discretion" apply proceeds of its collateral "in such order and manner as Lender [KST] shall determine". As it was entitled to do, KST applied the proceeds from the collected receivables against the Foothill Loan, which was senior to the Trade Payables. Therefore, JISCO's argument that the proceeds from the sale of the receivables were required to be credited against the Trade Payables is without foundation in the relevant agreement.

Further, approximately $8 million was advanced to Denro and SPU to meet their professed financial needs. This was made at the request of Denro and SPU. The Foothill Loan was a revolving loan which envisioned this type of transaction. After giving credit for the collected receivables, the balance of principal and interest owed by Denro and SPU pursuant to the Foothill Loan is in excess of $10 million. Thus, there has not been a surplus on the lockbox account which could be applied against the Trade Payables.

Pursuant to the Conversion Agreements, STS sold steel plate and pipe to third party customers. The plate and pipe were milled by Denro and SPU from steel slabs supplied by STS. The Conversion Agreements contained a formula for the division of profits. During the course of the Conversion Agreements, STS would typically submit a customer's order to either Denro or SPU (depending on whether STS had sold steel plate or steel pipe), so the order could be processed. From time to time, Denro or SPU would submit an invoice to STS for portions of the sales to customers, which, according to them, included their inventory as well as the inventory of STS. The aggregate amount of the invoices received by STS from Denro and SPU was approximately $8.5 million. Although Denro and SPU never provided STS with documentation supporting these invoices, STS credited them with all such amounts in STS's accounting of the transactions between them.

STS maintained an internal "loss chargeback" account, which essentially documented losses sustained by STS in connection with the workout effort. The total of the loss chargeback account

approximately $13.8 million. STS issued debit memos to SPU and Denro in such amount, and SPU and Denro signed confirmations for STS's auditors. Even if Denro and SPU were only charged with 75% of the losses (based on the specified division of profits, since there was apparently no contemplation of possible losses), its share of the losses would still be in excess of the Denro and SPU inventory sales by STS.

To summarize the above, KST has not received any surplus from the sales of inventory or collection of receivables which shall be deemed as a repayment of JISCO's debts to KST, neither as a consequence of the contractual relationships in connection with the loans or the Conversion Agreements. Even if KST had received any surplus from the sales of inventory or collection of receivables, such surplus should be deemed as a repayment of the Foothill Loan and not of the Trade Payables, since the security interest under the Trade Payables is subordinated to the security interest under the Loan according to the Security Agreement between SPU and KST dated 5 July 2001.

*Have the Trade Payables been rescheduled?*

KST has not agreed to reschedule JISCO's obligation to pay for the Trade Payables until 2008. KST agreed to forbear collection until 14 June 2002, but there was no agreement extending the due date of the Trade Payables further.

It is not correct that pursuant to the Amendments of the Forbearance Agreements of 4 April 2002 regarding the loans, the balance owed, on both the loans and the Trade Payables, was to be restructured and amortized from that date to 31 December 2008. The April 2002 Forbearance Agreements do not provide a defense to JISCO's obligation to pay for the steel slabs for the following reasons:

(i) JISCO was not a party to the Forbearance Agreements, which dealt only with (a) the loan owed by Denro and SPU and (b) the guaranties by Denro and SPU of the Trade Payables (not the primary obligation owed by JISCO).

(ii) The covenant to extend and restructure these debts of Denro and SPU was expressly "subject to the review and approval of Hermes Kreditversicherungs-AG". This condition was never satisfied.

(iii) The restructuring mentioned in the Forbearance Agreements was so vague as to be unenforceable, even if the condition had been met. For example, it did not even address when the first payment would be made or whether payments would be monthly, quarterly, or annual. Even though the proposed agreement envisioned an amortized payment schedule, neither Denro nor SPU ever prepared such a schedule. Moreover, neither Denro nor SPU ever tendered a payment based upon the alleged amortization schedule.

**JISCO:**

JISCO is based in Mumbai, India. It is led by Sajjan Jindal. Jindal SAW Ltd. (*"JSL"*) is based in New Delhi, India. It is led by P.R. Jindal. JSL's affiliates in the United States are SPU and Denro, doing business as Jindal United Steel Company. JSL also has a U.S. branch operating in Baytown.

In 1993, SPU bought a pipemill in Baytown, Texas, from U.S. Steel. In 1997, Denro bought the adjacent plate mill from U.S. Steel. Denro cuts and rolls thick steel slabs into thinner plates, and many Denro plates are processed into pipes at the adjacent SPU mill.

KST is a company organized under the laws of Germany. Its present name is Balli Klöckner GmbH, but until 2001, its legal name was Klöckner Steel Trade GmbH. KST was owned by Klöckner & Co. AG until December 2000, when KST was acquired by Balli Klöckner plc, a company organized under the laws of England and Wales.

Balli Klöckner, Inc. (*"BKI"*) is a Delaware corporation that is indirectly wholly owned by Balli Klöckner plc.

Balli Klöckner plc is wholly owned by Balli Steel plc (*"Balli Steel"*). Balli Steel in turn is wholly owned by Balli Group plc. The Chairman of Balli Group plc is Vahid Alaghband and its CEO is Nasser Alaghband.

STS is a Delaware limited liability company the sole owner of which is BKI.

The Balli entities are all ultimately owned and/or controlled by the Iranian brothers Vahid Alaghband, Nasser Alaghband and Hassan Alaghband through a Liechtenstein entity called "Balli Stiftung". The Alaghband brothers exercise control over Balli Group plc and direct the operations of Balli Group, Balli Klöckner plc, BKI, KST and STS. Unless otherwise specified, all references to Balli are references to actions originating with the Alaghbands and the Balli Companies.

In August 2001, Klöckner & Co. itself was bought by Balli Stiftung. Balli was later forced to divest Klöckner & Co. as the result of a financial scandal over Balli's illegal removal of funds from Klöckner & Co. to finance the acquisition. On 12 December 2005, pursuant to their confessions, two of the Alaghband brothers were found guilty and sentenced by the District Court in Duisburg, Germany. Hassan Alaghband, who was an officer of Klöckner & Co. after the takeover, was found guilty of breach of fiduciary duty and received a probated prison sentence of one and a half years, and a fine of €2.25 million. The court found Vahid Alaghband guilty of inducing a breach of fiduciary duty and sentenced him to a prison sentence of one and a half years, also probated, and a fine of €1.5 million.

*Relevant facts*

During 1998-2000, Denro bought steel slabs from KST with JISCO listed as nominal buyer. KST shipped some $89 million worth of steel slabs to Texas, for which Denro paid over $66 million, leaving a balance of approximately $22.8 million in Trade Payables.

In 2001, Denro owed debts to other creditors as well, and was facing financial difficulties due in large part to restraints U.S. Steel imposed on Denro's freedom to sell its products. In the spring of 2001, Jindal was in the process of working out Denro's debts. Jindal had reached a tentative agreement to sell the SPU pipe mill in order to raise money to pay outstanding suppliers and creditors, which included KST. However, the deal did not go through, because Vahid Alaghband convinced P.R. Jindal not to sell the pipe mill, but enter into an arrangement with Balli instead.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION

In early May 2001, P.K. Rahlon of Jindal was in the process of working out the Trade Payables with Udo Weinem, a KST sales representative, who suggested a meeting between Jindal and KST's new owners. On or about 15 May 2001, Indresh Batra of Jindal met in Baytown with Nasser Alaghband, CEO of Balli Steel plc. Nasser Alaghband was very interested in the pipe mill and said that it had great potential.

Weinem arranged a meeting a few days later in Houston between P.R. Jindal, Batra and Vahid Alaghband, Chairman of Balli Group. At the meeting, P.R. Jindal explained to Vahid Alaghband that he planned to sell the pipe mill in order to pay the debts owed to KST and other slab suppliers. Vahid Alaghband implored him not to sell the pipe mill, which he praised as the "Crown Jewel" of the Jindal operations. He said Jindal should not cut off one hand to save the other. Vahid Alaghband said that the Jindal Baytown mills had tremendous potential and lacked only a steady supply of slabs and working capital. He proposed instead a Balli-Jindal joint venture to combine the Balli expertise in buying and selling steel with the Jindal expertise in making steel products. He said Balli would supply the slabs, Jindal would turn the slabs into plates and plates into pipe, and Balli would sell the finished products. Jindal's share of the profits would go to pay off Jindal's debts. Balli would reschedule the $22.8 million owed to KST and also use its connections to work out Jindal's debts with other creditors. Balli's enormous financial resources would provide the capital needed for the venture. Vahid Alaghband told P.R. Jindal and Batra to expect a visit from Beat Frei, a financial expert who would put together the deal Vahid Alaghband proposed.

Beat Frei introduced himself as a Balli consultant working through Balli Finance and Development Corporation. He came to Baytown during the third week of May 2001 and began preparing a model of cash flow projections based on inputs of volumes and prices from Balli personnel and inputs on plant operating capacity and costs from Jindal employees, including P.K. Rahlon. Frei took all the historical information on production, revenue and cost records of the plate and pipe mills, as well as their customer lists.

According to Frei's draft business plan, the plate mill was to roll 50,000 tons of steel per month. Its capacity is over 80,000 tons per month or about 1 million tons per year.

On 28 and 29 May 2001, P.R. Jindal and Batra met with Vahid Alaghband and Frei in London. Before meeting with Vahid Alaghband, Frei showed his business plan to P.R. Jindal and Batra. The Balli cash flow projections showed profits of over $200 million over the first ten years of the joint venture, more than enough to satisfy Jindal's creditors and provide profits for Jindal and Balli.

At the meeting between the Balli and Jindal principals, Vahid Alaghband again laid out his plans for a joint venture. He repeated that Balli had the expertise and the connections to supply the mills with slab and to sell the finished plate and pipe. Vahid Alaghband stressed that Balli had the capital to invest to make the joint venture work, to bring the mills up to optimal condition, and that he was willing to put into the venture whatever capital was required. Vahid Alaghband proposed that the joint venture vehicle be a new entity wholly owned by Balli and headed by his brother Nasser. That entity would become STS. Vahid Alaghband represented that Balli would provide capable managers to run the joint venture.

On 7 and 8 June 2001, P.R. Jindal, Indresh Batra and P.K. Rahlon again met in London with Vahid Alaghband and Ralph Voltmer, a partner with Covington & Burling, the Washington, D.C. law firm Balli hired for the transaction.

Relying on the Balli business plan and Vahid Alaghband's pledge of the slabs and working capital to make it work, on 8 June 2001 P.R. Jindal signed the 2001 MoU on behalf of the Jindal parties, including JISCO. Vahid Alaghband signed for the Balli parties, including KST.

The 2001 MoU provided that the Balli parties and the Jindal parties would form a joint venture with a term of 10 years pursuant to which:
– the joint venture or a designated Balli party would exclusively buy steel slabs to be processed by Denro into plates,
– the joint venture or a designated Balli party would be the exclusive seller of Denro's plates to parties other than SPU,
– the joint venture would be the exclusive seller of SPU's pipes,
– Denro's and SPU's facilities would not be used for any purpose except to satisfy orders obtained by the joint venture or a designated Balli party,
– after covering costs of operation and production and raw materials, profits would be split 25% to the Balli parties and 75% to the Jindal parties,
– the Jindal profits would go to repay debts, which Balli would restructure,
– the Balli parties would manage the joint venture until the Jindal debts were paid,
– the Balli parties would reschedule the KST payables and other loans owed to it by Denro and SPU (i.e. the Foothill Loan) for which the Balli parties would receive a $0.5 million restructuring fee.

In late June 2001, Balli and Jindal were working on the security agreements to support KST's buyout of the Foothill Loan. This Loan was secured by liens on SPU's pipe mill, receivables and inventory and Denro's receivables and inventory. The Balli draft agreements extended the security interest in the SPU and Denro assets to the unsecured $22.8 million Trade Payables. Batra was concerned about providing this security – even before any other joint venture documents had been signed – in case the joint venture and discussions with other creditors did not work out.

Batra and Rahlon had airplane tickets to Atlanta to meet with Foothill to extend the Loan. The $5.6 million debt was more than matched by SPU's and Denro's inventory and receivables, which were valued at $17-18 million. In just the time since signing the 2001 MoU, Jindal had reduced its debt to Foothill from about $8.5 million to $5.6 million, and Batra and Rahlon were confident that the Loan would be extended.

Batra spoke to Vahid Alaghband on the telephone. Vahid Alaghband convinced Batra to sign the pledges with assurances of the success they would enjoy together in their joint venture and the promise to return the Trade Payables to the same unsecured position if the proposed joint venture and the restructuring of other Jindal debts did not work out. Batra cancelled the trip to Atlanta and decided that SPU and Denro should sign the security agreements.

On 5 July 2001, KST bought the Foothill Loan from Foothill for $5.53 million. The security agreements with Foothill were extended to include the $22.8 million Trade Payables. KST took security interests in virtually all the assets of Denro and SPU, including Denro's and SPU's inventory and receivables and a Foothill lockbox bank account into which Denro's and SPU's receivables were paid.

With the signing of the security agreements, Balli announced its joint venture with Jindal in a 12 July 2001 press release. Balli noted that it would "provide slabs by using its extensive

global logistics network and supply chain management services", and boasted that it is "the world's second largest independent trader of steel". Far from being a reluctant participant in the venture, Balli proclaimed that "[t]he Jindal alliance is in line with Balli Steel's strategy of increasing its activities in the high added value segments of the steel market, in particular in the growing oil and gas sector".

On 28-29 November 2001, Balli and Jindal also entered into other agreements to further the joint venture, including the Master Plate Conversion Agreement and the Master Pipe Conversion Agreement, under which STS paid "tolling fees" to Denro and SPU to produce plate and pipe. Denro and SPU became totally dependant on STS and its Balli affiliates for their supply of steel slabs and the sale of plates and pipes made from those slabs. Denro and SPU could deal with no other companies; their operations were effectively "ring-fenced" – a term used by Balli and its lawyers.

As provided in the 2001 MoU, Balli managed the joint venture from the start. Batra was named as the initial Chairman of STS, but he resigned in favor of Nasser Alaghband. Udo Weinem of KST was its CEO. Balli managed from London the minute details of STS's operations, including what slabs it would buy from Balli and what customers STS would sell to and on what terms.

However, Balli never put in the capital that was needed to sustain the joint venture – not close to the $50 million that Vahid Alaghband represented he was willing to put in and not the $40 million the Balli Business Plan indicated would be needed, given the lead times between slab purchases and collection for finished products it projected.

Indeed, KST now contends that it financed the joint venture operations by taking money out of the Foothill-KST lockbox – money from the liquidation of Denro's and SPU's inventory and receivables that should have gone to pay down the Trade Payables.

In an e-mail to Nasser Alaghband, STS Controller and acting CFO Jeff Sylvester explained how BKI's and STS's sales of Jindal's pre-joint venture inventory and joint venture funding should have been handled. Sylvester noted that in "the early stages of the start up the sales generated by STS were pure pass through Jindal and SAW stock [i.e. from liquidation of Jindal's pre-joint venture inventory]. - - - An attempt to estimate and segregate this information from the STS business [i.e. joint venture sales] is presented in these financial statements." Proceeds from these sales went into the Foothill-KST lockbox. On the other hand, "STS to Jindal or SAW fundings are recorded as payment or advances of tolling fees".

In fact, however, Balli had been raiding the Foothill-KST lockbox to fund the joint venture's early operations. In October 2001 Jindal Controller Sanjay Pipalia was seeking to reconcile the lockbox account and joint venture funding. Sylvester responded: "We funded much more to Denro/SAW than what is received via Foothill lockbox so I don't understand specifically what you are requesting. - - - As laid out in the report the current fundings are considered payments or advances of tolling fees."

Indeed, Balli not only took from the lockbox to fund the Jindal-Balli joint venture operations, it also cleared out the account to help finance its acquisition of Klöckner & Co. On the eve of the Klöckner & Co. acquisition, Vahid Alaghband ordered a sweep of the account, leaving STS without means to fund requests for the joint venture operations.

In April 2002, Indresh Batra and P.K. Rahlon finally were able to meet with Nasser Alaghband to tell him the problems the joint venture was experiencing. In July 2002, P.R. Jindal, Batra, Rahlon and Neeraj Kumar of Jindal returned to London to meet with Vahid Alaghband and protest the poor state of affairs in Baytown.

Through the first half of 2003 the joint venture continued to deteriorate. Batra, Neeraj Kumar, and Rahlon travelled to London on 28 and 29 May 2003 to meet with Nasser Alaghband and Jeff McCarthy. The purpose of the meeting was to try to get the joint venture back on track, but also to come to some further agreements about the debt owed to KST, particularly the $22.8 million Trade Payables.

On 29 May 2003, Nasser Alaghband and Batra signed the 2003 MoU. In the 2003 MoU, Nasser Alaghband acknowledged on behalf of the "Balli Parties" -- including KST -- that Balli's liquidation of the Jindal Baytown Companies' accounts receivable and inventory produced "about $14 million" that was to be applied against the debt owed to KST and that the security interests KST held on Denro and SPU property were to be reduced accordingly.

During the meeting, Nasser Alaghband had agreed that the security on Denro was to be released, and that the remaining debt was to be paid from the profits generated by the joint venture.

The Jindal and Balli parties agreed to address separately the losses the joint venture had incurred.

On 4 August 2003, Batra returned to London to complain about Balli's continued non-performance. Nasser Alaghband told him bluntly that Balli would no longer support the joint venture and that Jindal should shut down the Denro and SPU plants. On 7 August 2003 in Baytown, Jeff McCarthy confirmed that Balli would no longer provide funds to pay for slabs or pay tolling fees to Denro and SPU -- even for material already produced. Jeff McCarthy recommended to Batra that Jindal buy out STS.

On 12 August 2003, Batra sent a letter to Nasser Alaghband and Jeff McCarthy reiterating Balli's failure to fulfil its obligations and asserting a constitutional lien on the steel products Denro and SPU had produced but Balli and STS would not pay. With no satisfactory response, Jindal had little choice but to have Denro and SPU file suit in a Texas court against various Balli entities, including KST, for breach of contract, breach of fiduciary duty and fraud.

KST seeks to recover the same Trade Payables in the Texas litigation. It has twice sought to foreclose on SPU's pipe mill, but was enjoined from doing so on 5 April 2005.

*Should the amount of the Trade Payables be reduced?*

With its 5 July 2001 acquisition of the Foothill Loan, KST acquired a Foothill lockbox account into which Denro's and SPU's accounts receivables were paid.

In July 2001, KST's Houston affiliate BKI began liquidating Denro's and SPU's accounts receivable and inventory. The Jindal receivables were paid into the KST lockbox. BKI also began selling the Jindal companies' inventory. Funds from inventory sales were paid to BKI.

When STS was formed in August 2001, it took over the collection of Denro's and SPU's pre-joint venture receivables and the sale and collection of Denro's and SPU's pre-joint venture inventory, including plates and pipes made from slabs that had been part of the Jindal Baytown Companies' pre-joint venture inventory.

Through this liquidation effort, $5.7 million was paid into the KST lockbox, and $8.8 million from inventory sales was paid to STS, which accounted for these amounts on a "pass-through" basis and maintained on its books account payables to Denro and SPU for these sales. In Jindal's opinion, the inventory was worth considerably more than $8.8 million.

It was always understood between Jindal and Balli that the amounts Balli realized from liquidating Denro's and SPU's receivables and inventory would go to reduce the Trade Payables – the debt that brought Balli and Jindal together in the first place.

It was also understood between Balli and Klöckner & Co. (which along with its parent E.ON had guaranteed the Jindal trade receivables when KST was sold to Balli) that proceeds from Balli's liquidation would go to pay off that debt and not, as KST now contends, be "re-lent" to Denro and SPU for their operations. In July 2001, Ralf Oberhuber of Klöckner & Co. wrote to Jeff Sylvester, the Balli employee overseeing the liquidation:

"Furthermore I like [sic] to know what kind of reporting is available for the liquidation of the pledged receivables and the inventories?

- - -

Who makes sure that no funds out of the pledged assets will be rerouted by Jindal people and what measures have been take [sic] to ensure the same? I understood from Mr. Frei that the pledged Lockbox account is in favour of Klöckner Steel Trade GmbH. Therefore nobody should be able to transfer any funds out of this account as we have not given any authorization to anyone to act on our behalf.

Furthermore Mr. Frei told us that there will be an additional Lockbox for all sales out of the inventory. All funds coming into this account should be used for repayment of the Loan to us."

The Security Agreement between SPU and KST also contemplates that all cash proceeds from a sale of secured assets will be used against the obligations, i.e. in this case the Trade Payables.

Moreover, in the 2003 MoU, executed two years after the Security Agreement and Guaranty and long after Balli had begun liquidating the pre-joint venture assets, the parties record what they thought they had done under the 2001 MoU, the joint venture agreements and the Security Agreement and Guaranty. They state that, based on the assignment of the Foothill Loan to Balli and the Trade Payables owed by Jindal to Balli a total repayment obligation had arisen as per the forbearance agreement and that this had resulted in Balli liquidating the Jindal inventory and receivables existing prior to the arrangement entered into with Balli. They further declare that their intention was that the amount of approximately $14 million so realized would be set off against the Jindal repayment obligation and that the encumbrance on the security provided would be reduced by the same amount.

Thus, the 2003 MoU records that the parties did precisely what one would expect the parties to the 2001 MoU, the Security Agreement and the Guaranty to have done: used the pledged assets to reduce the debts for which they were pledged.

In the 2003 MoU, KST acknowledged that Balli's liquidation of the Jindal Baytown Companies' accounts receivable and inventory produced "about $14 million" that was to be applied against the debt owed to KST and that the security interests KST held on Denro and SPU property were to be reduced accordingly.

The evidence clearly demonstrates that the larger part of the original Trade Payables balance of $22.8 million has been paid. KST acknowledges that it has received $14.5 million from the cash proceeds of its liquidation of Denro's and SPU's accounts receivable and inventory.

The effect of the Arbitral Tribunal's Decision on jurisdiction (to which JISCO respectfully objects) is to confirm JISCO as the principal obligor on the Trade Payables, thus making Denro and SPU guarantors of the JISCO obligation. As the Arbitral Tribunal has acknowledged, however, the sales of steel were accomplished for Denro. Thus, the economic reality of the transaction is that JISCO acts as guarantor and Denro is the party directly responsible to KST under the parties' agreements and pursuant to their course of conduct.

German law applies to the Trade Payables. Section 362 of the German Civil Code (*Bürgerliches Gesetzbuch*) provides:

"Das Schuldverhältnis erlischt, wenn die geschuldete Leistung an den Gläubiger bewirkt wird."

(English translation: "An obligation is extinguished if the performance owed is made to the creditor.")

It does not matter who performs, as long as the performance is not characterized as "personal" – such as in some matters of labour law. Thus, Section 267 of the German Civil Code amplifies:

"Hat der Schuldner nicht in Person zu leisten, so kann auch ein Dritter die Leistung bewirken. Die Einwilligung des Schuldners ist nicht erforderlich."

(English translation: "If a debtor does not have to perform in person, a third party may also make performance. The approval of the debtor is not necessary.")

In this case, it is plain that payment of the Trade Payables was not a "personal" obligation of JISCO, but is one that can be discharged by Denro and SPU. Indeed, it was recognized from the beginning of the Jindal-KST relationship that Denro would be responsible for paying for the steel slabs it bought from KST, and KST later formalized that relationship by having Denro and SPU sign guarantees of that debt.

Under German law, when a guarantor (*Bürge*) pays according to a guaranty (*Bürgschaft*), the creditor may not claim (again) performance from the principal debtor. Section 774 of the German Civil Code specifically provides that the claim of a creditor against the principal debtor is transferred to the guarantor to the extent that the guarantor satisfies the creditor. Thus, performance by the guarantor extinguishes the principal debtor's obligation to the extent of the guarantor's performance. This is specifically noted in the commentary to the Civil Code (*Münchener Kommentar*), § 774 note 3 (4th ed., Munich 2004).

Regardless of whether one analyses the arrangements with JISCO as guarantor or principal obligor, under the German law, which applies to the Trade Payables, JISCO is entitled to benefit from any reduction in the principal amount of the underlying obligation, regardless of by whom, how, when or in what manner that obligation is reduced. Thus, payments by